```
1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3              - - - - -

4

5  UNITED STATES OF AMERICA,        )
                                    )
6                 Plaintiff,        ) Case No. 4:16CR310
                                    )
7            vs.                    )
                                    )
8  BRENT SEE,                       )
                                    )
9                 Defendant.        )

10

11             - - - - -

12

13     TRANSCRIPT TRIAL TESTIMONY OF MATTHEW GARY,

14     WILLIAM SWIFT, AND STEVEN HOWARD, BEFORE

15     JUDGE DONALD C. NUGENT, JUDGE OF SAID COURT,

16     AND A JURY, ON WEDNESDAY, FEBRUARY 15TH, 2017,

17         COMMENCING AT 8:30 O'CLOCK A.M.

18             - - - - -

19

20

21

22  Court Reporter:          GEORGE J. STAIDUHAR
                             801 W. SUPERIOR AVE.,
23                           SUITE 7-184
                             CLEVELAND, OHIO 44113
24                           (216) 357-7128

25
```

2

```
1    APPEARANCES:

2        On behalf of the Government:

3            OFFICE OF THE U.S. ATTORNEY - YOUNGSTOWN
             BY:  DAVID M. TOEPFER, AUSA
4            325 City Centre One
             100 East Federal Plaza
5            Youngstown, OH 44503

6                    and

7            OFFICE OF THE U.S. ATTORNEY
             BY: CARMEN HENDERSON, AUSA
8            801 W. Superior Ave., Suite 400
             Cleveland, OH 44113

9

10       On behalf of the Defendant:

11           BETRAS, MARUCA, KOPP & HARSHMAN - CANFIELD
             BY:  DAVID J. BETRAS, ESQ.
12           6630 Seville Drive
             Canfield, OH 44406

13

14                   - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

3    Agent Matthew Gary         4      10       36

4    Agent William J. Swift    39      72       96        99

5    Steve Howard             103     120      151

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Agent Gary - Direct

```
 1
 2      *        *        *        *        *        *
 3              MR. TOEPFER:  Your Honor, we call
 4   Special Agent Matt Gary.
 5                    MATTHEW GARY
 6   called as a witness by and on behalf of the Government,
 7   being first duly sworn, was examined and testified
 8   as follows:
 9              THE COURT:  Tell us your full name, and
10   spell your last name.
11              THE DEFENDANT:  Matthew Gary, G-a-r-y.
12              THE COURT:  Thank you.
13                  DIRECT EXAMINATION
14   BY MR. TOEPFER
15   Q.   Agent Gary, what do you do for a living?
16   A.   I am a Special Agent with the Bureau of Alcohol,
17   Tobacco, Firearms & Explosives.
18   Q.   And how long have you been with ATF?
19   A.   A little over eight years.
20   Q.   Tell us about your education, training, and
21   experience?
22   A.   I have a Bachelor's Degree in forensic science.
23   After that, I worked for the coroner's office in
24   Allegheny County as a death investigator.  After that, I
25   worked approximately three years as a private
```

Agent Gary - Direct

1   investigator.

2          Then I went to the Department of Homeland

3   Security, Immigration of Customs Enforcement

4   for approximately three years before coming over to

5   ATF.

6   Q.   What kind of specialized training do you have

7   regarding firearms?

8   A.   I am a firearms instructor, so I show other agents

9   and help them with training as far as qualifying and

10  staying proficient with marksmanship.

11  Q.   What I would like to do now is turn your attention

12  back to January 20th, 2016.

13          Did you meet with somebody named Brent See

14  that day?

15  A.   Yes.

16  Q.   Do you see him in the courtroom?

17  A.   Yes.

18  Q.   Would you point to him, and tell us what he is

19  wearing?

20  A.   Sitting in front of me with the black suit and blue

21  and gray striped tie.

22          MR. TOEPFER:  May the record reflect the

23  witness identified the Defendant?

24          THE COURT:  It may.

25

```
 1    BY MR. TOEPFER:

 2    Q.    Where did you that take place?

 3    A.    That was at his residence.

 4    Q.    Which is where?

 5    A.    In East Palestine.

 6    Q.    Is that located within the Northern District of

 7    Ohio, Eastern Division?

 8    A.    Yes.

 9    Q.    Why were you there?

10    A.    We were following up on a tip regarding a tip that

11    we had received of Mr. See possibly making silencers.

12    Q.    And what also information did you have?

13    A.    We had a few photos provided from the individual who

14    gave us the tip and also that he had shown up at her

15    house to take receipt of a few packages that were shipped

16    to her address in his name.

17    Q.    Did you have anybody with you when you went down to

18    visit him?

19    A.    Yes.

20    Q.    Who was with you?

21    A.    Our task force officer, John Aeppli.

22    Q.    What's a task force officer?

23    A.    He is a member of the Youngstown Police Department

24    who is permanently assigned to the ATF.

25    Q.    Tell us what happened when you got down there.
```

Agent Gary - Direct

1   A.    We made contact with Brent See, and we went into his

2   workshop area.  We spoke in the front room, which is like

3   an office and a computer room for a little while, about

4   life and what has been transpiring with him.  He afforded

5   us an opportunity to look around his workshop so we went

6   in the back room where he has a CNC mill and CNC lathe

7   and other types of equipment.

8           At one point, I showed him the photographs

9   that the person that gave us the tip provided to me, and

10  he said they were not silencers, and they were legal to

11  make.

12  Q.    Let's talk about those pictures for a moment.  Can

13  we have the toggle for our computer, please?

14          Agent Gary, I would like to start by showing

15  you what has been previously marked as Government's

16  Exhibit 16.  Can you tell us what this is?

17  A.    Yes.  It is one of the photos that I was provided.

18  Q.    And one of the photos you took with you when you

19  went to see the Defendant that day?

20  A.    Yes.

21  Q.    Let's take a look, then, at Government's Exhibit 17.

22  What is that?

23  A.    That's another photo that I was provided.

24  Q.    Government's Exhibit 18, what is that?

25  A.    Another photo that I was provided.

Agent Gary – Direct

1    Q.    And Exhibit 19, what is that?

2    A.    Another photo that I was provided.

3    Q.    When you were talking with the Defendant at his

4    shop, did you see anything like the items depicted in the

5    four photos we just saw?

6    A.    We saw metal scraps and pieces; nothing specifically

7    looking like those items.

8              MR. TOEPFER:  Can we have the overhead,

9    please?

10   BY MR. TOEPFER:

11   Q.    I am now going to show you Exhibits 1, 2, 3, and 4.

12   Did you see anything at the time you were meeting with

13   him that looked like these items in the shop?

14   A.    No.

15   Q.    So as you were having this discussion with him, did

16   you talk about firearm parts or things that he was making

17   in the shop?

18   A.    Yes.

19   Q.    Tell us about that.

20   A.    He told us that he was intending to make something

21   for a firearm, some type of part.  I don't remember what

22   he called it.  At that point, I urged him, if he were to

23   make anything firearm related, that he should contact ATF

24   Firearms Technology Branch.

25             MR. BETRAS:  Objection, your Honor.

1    THE COURT:  Overruled.

2    BY MR. TOEPFER:

3    Q.    What is the ATF Firearm Technology Branch?

4    A.    It is a portion of ATF that they cover the

5    scientific determination and analysis of firearms and

6    their classification.

7    Q.    Why did you encourage him to contact those people?

8    MR. BETRAS:  Objection, your Honor.

9    THE COURT:  Overruled.

10   A.    Based upon his probation, I wanted to make sure

11   if he were making anything firearm related, that he was

12   sure of what he was doing, and that he should contact

13   them.

14   Q.    Now, you yourself working for the ATF, you mentioned

15   you are a firearms instructor.

16   Would you feel comfortable making a

17   determination whether or not something was a silencer

18   part?

19   A.    No.

20   Q.    If you had a question about that, who would you

21   contact about that?

22   A.    ATF FTB.

23   Q.    That's the ATF Firearms Technology Branch?

24   A.    Yes.

25   Q.    When you told him to contact the FTB, how did he

Agent Gary - Direct

1    respond?

2                    MR. BETRAS:  Objection.

3                    THE COURT:  Overruled.

4    A.    He didn't respond.  He just acknowledged it.

5    Q.    Was this the first time you had this kind of

6    conversation with Mr. See?

7    A.    Verbally, yes.

8    Q.    Was there a time when you exchanged a couple of

9    e-mails with him?

10   A.    Yes.

11   Q.    If we could go back to the computer, I would like to

12   show you what has been marked as Government's Exhibit 29.

13   Can you tell us what this is?

14   A.    Yeah.  This is an e-mail string that we recovered

15   from his computer.

16   Q.    And where it shows messages from Matthew Gary, ATF

17   Special Agent, is that your e-mail?

18   A.    Yes.

19   Q.    And e-mail from Brent See 76@Yahoo.com, who is that

20   e-mail address for?

21   A.    That's for Brent See.

22   Q.    Tell us what you said in this e-mail.

23   A.    He had sent me several e-mails at which time I

24   finally responded to him, and I wrote "I would strongly

25   urge you to check with ATF Firearms Technology Branch to

Agent Gary — Direct

1   see if you are able to make these parts.  They can be

2   contacted at 304-260-3414.  They are the branch that

3   would make the determination anyways.  Thanks."

4   Q.    So at any time when you contacted him in person or

5   sent him this e-mail string, did you ever indicate to him

6   that parts that looked like Exhibits 1, 2, or 3, that it

7   was proper for him to make these things?

8   A.    No.  We had never seen those parts.

9   Q.    At any point did you ever tell him that these were

10  legal?

11  A.    No.

12  Q.    Or that anything that looked like these were

13  legal?

14  A.    No.

15  Q.    I would like to now move ahead to June 29,

16  2016.  Did you have a discussion with Ashley Frank that

17  day?

18  A.    Yes.

19  Q.    What did you learn from her?

20  A.    She had informed me that she was out at the

21  residence or had just visited Brent See as part of a home

22  visit, and that she had discovered some items that she

23  thought were suspect of being a potential silencer.

24  Q.    And would those have been Government's Exhibits 1,

25  2, 3, and 4 that we talked about already?

Agent Gary – Direct

1    A.    Yes.

2    Q.    What did you do with those when she gave them to

3    you?

4    A.    I took photos of them and sent the photos to ATF

5    Firearms Technology Branch, who then requested to

6    physically examine those items.

7    Q.    And did you send them out at some point?

8    A.    I did.

9    Q.    Based on your conversations that you had with FTB,

10   at that point, what did you learn?

11   A.    They informed me that three out of the four that we

12   had sent to them were classified as silencers.

13   Q.    Once you got that information, what did you do

14   next?

15   A.    I consulted with a Federal Judge and obtained a

16   search warrant.

17   Q.    For where?

18   A.    For his address in East Palestine.

19   Q.    And did you also have a search warrant that covered

20   the machine shop where he was working?

21   A.    Yes.

22   Q.    So let's jump ahead, then, to August 9, 2016.  Is

23   that the day you executed the search warrant?

24   A.    Yes, it is.

25   Q.    And describe for us, generally speaking, what you

1    found.

2    A.    Generally, there was the workshop, looked to be

3    basically in the same condition as I had last visited.

4    There was a front entry way with a computer and a couple

5    of computers and a desk.  That room goes back into the

6    workshop area.  In the workshop area, there is a back

7    storage room, and there is also a connection through

8    to an adjoining business, which is an automotive

9    business.

10   Q.    Did you take photographs when you were doing all

11   this?

12   A.    Yes.

13   Q.    Let's start by taking a look at Government's Exhibit

14   20.  What does this show?

15   A.    That's the front door area of the workshop

16   related to Brent See, See n See Tool and Machine, I

17   believe.

18   Q.    Exhibit 21, what is this?

19   A.    That's another photo of the front door of his

20   workshop.

21   Q.    Exhibit 22.

22   A.    That's a picture of the back room where he had all

23   of his machinery.

24   Q.    23?

25   A.    That's in the same area.  I am not sure if that's a

Agent Gary — Direct

1    CNC mill or CNC lathe.

2    Q.   Exhibit 24, what's that?

3    A.   That's in the same area as well, more equipment for

4    machining.

5    Q.   Exhibit 25?

6    A.   That's a photo of one of the eventual classified

7    silencers that was in the fabrication process.

8    Q.   It is clearly still in the machine at this

9    point?

10   A.   Yes.

11   Q.   Exhibit — is this 25 or 26?

12   A.   That's a closer up view of the same item.

13   Q.   Exhibit 27?

14   A.   This is the storage bins.  As you walk in the front

15   door, there is a counter to the left-hand side, and then

16   there is several of these bins with items that were

17   eventually classified as silencers.

18   Q.   And then Exhibit 28?

19   A.   An item classified as a silencer that was found in a

20   toolbox.

21   Q.   What did you do with these items after you saw

22   them?

23   A.   We photographed them, and then we collected them.

24            MR. TOEPFER:  Your Honor, could I ask Agent

25   Gary to step down for a moment?

Agent Gary − Direct

```
1        THE COURT:  Sure.
2    BY MR. TOEPFER:
3    Q.   Agent Gary, I want to start by showing you what is
4    Government's Exhibit 5.  Can you tell us what this is?
5    A.   Yes.  This bag is basically one of the storage bins.
6    We put them in a plastic bag to recover them.  We just
7    did that to make it easier to count them back at the
8    office, but these were suspected silencers.
9    Q.   Exhibit No. 6?
10   A.   Same thing basically, just in a different bin.  We
11   took each bin and put them in a bag.
12   Q.   Exhibit No. 7?
13   A.   Same, suspected silencers.
14   Q.   So basically, each bag represents a separate bin
15   that you were pulling these out of.  Is that fair to
16   say?
17   A.   I believe so.  They may have been combined at some
18   point but generally speaking.
19   Q.   So then Exhibits 8, 9, and 10?
20   A.   Yes.  Some are a little bit larger in size, and they
21   were kind of separated in the bins as far as size.
22   Q.   Exhibit No. 11 and 11 A?
23   A.   11 are suspected silencers.  11 A, after we sent
24   them to the lab, they determined that this one was not a
25   silencer.
```

Agent Gary - Direct

1    Q.    Exhibit 12 and 12-A?

2    A.    12, after we sent it to the lab, 12, they determined

3    it was a silencer.  12-A was not a silencer.

4    Q.    Exhibit 13?

5    A.    Exhibit 13 is also a suspected silencer.

6    Q.    Exhibit 14?

7    A.    The same, suspected silencer.

8    Q.    And for all these Exhibits 5 and through and

9    including Exhibit 14, were these all found inside the

10   shop that day?

11   A.    Yes, sir.

12   Q.    Tell us about Exhibit No. 15.

13   A.    Exhibit 15 was found in this packaging in the

14   mailbox that we were able to find one package, and we

15   felt it was a silencer as well, and it was determined

16   that it was.

17   Q.    And do all these items appear to be in substantially

18   the same condition as the day you seized them from the

19   shop?

20   A.    Yes.

21   Q.    Okay.  Go ahead and sit back down.

22   BY MR. TOEPFER:

23   Q.    So after you collected all these items, what did you

24   do with them?

25   A.    We took them back to the office and put them into

Agent Gary - Direct

1   our computer system and into our evidence vault.

2   Q.   What did you do after that with them?

3   A.   Eventually, we sent them to ATF Firearms Technology

4   Branch who made a formal classification of those

5   items.

6   Q.   Now, did you learn how the Defendant was selling

7   these items?

8   A.   Yes, on eBay.

9   Q.   Did you obtain any records from eBay to verify what

10  was being sold and how long it was being sold?

11  A.   I did.

12  Q.   Let me, I would like to then show you Exhibit No.

13  31.  This is a 28-page document.  Can you tell us what

14  this is?

15  A.   Yes.  That's the front page of the documents

16  provided from eBay related to See n See Tool Machine,

17  which is the ID number he used.

18  Q.   And if we can jump to page 3 of this document.

19          MR. BETRAS:  I'm sorry?  What page are you

20  on, Mr. Toepfer?

21          MR. TOEPFER:  Should be No. 3.

22  BY MR. TOEPFER:

23  Q.   If we look, for example, at just this bottom

24  line here of the portion that has been highlighted,

25  can you describe for us the information that is listed

Agent Gary — Direct

1    there?

2    A.    Yes.    The spreadsheet provided from eBay had the

3    following information:    The user ID, which is See n See

4    Tool Machine; has the description of what was listed on

5    eBay and the section that is highlighted.    It is a .22

6    caliber 223 Super Guild muzzle brake, slant slide ports,

7    one and a half by 28 pitch.

8                    The next line item over, I believe, is how

9    many were being sold, and then after that, it was how

10   many purchased and then the purchase price.    It could be

11   the listing price, I am not sure, and also the date and

12   who had purchased them.

13   Q.    So based on this record here, they were certainly

14   being sold in June of 2015.

15                    Do you know when the first one went out

16   according to the eBay records?

17   A.    I believe April —

18   Q.    Of 20 —

19   A.    — 2015.

20   Q.    And then, if we could jump down to page 28 of this

21   document — I'm sorry — not page 28.    Hold on one

22   second.    Excuse me.

23                    If we can take a look at the last couple of

24   lines, the spreadsheet on page 20.

25                    MR. BETRAS:    Page 20, Mr. Toepfer?

Agent Gary - Cross

```
1              MR. TOEPFER:  Yes.
2    BY MR. TOEPFER:
3    Q.   According to this, when is the last time something
4    was sold over eBay described as a muzzle brake?
5    A.   August 9th, 2016, was the sale end date and time
6    there, and that was the same date that we executed the
7    search warrant.
8    Q.   And refers to some dates and times in July as well.
9    What are those dates and times?
10   A.   That would be the sale start date, which is when I
11   believe he actually posted it to eBay for sale.
12   Q.   But then it went out on August 9th?
13   A.   Yes.
14              MS. HENDERSON:  Can I have a moment, your
15   Honor?
16              THE COURT:  You may.
17               (Pause.
18              MR. TOEPFER:  Thank you.  Nothing further.
19              THE COURT:  Thank you.  You may
20   cross-examine.
21              MR. BETRAS:  Thank you.
22                 CROSS EXAMINATION
23   BY MR. BETRAS
24   Q.   You are not an expert in determining whether
25   something is a silencer or not, correct?
```

Agent Gary — Cross

```
 1    A.    That's correct.
 2    Q.    And when you looked through my client's eBay
 3    records, it is fair for me to say that all of these items
 4    here were marketed and told to the public as being muzzle
 5    brakes, correct?
 6    A.    I believe based upon the description of what he had
 7    wrote in eBay.
 8    Q.    Correct.  He didn't say to anyone on eBay these were
 9    silencers or silencer parts, correct?
10    A.    He didn't describe them as silencer parts.  Part of
11    the description he did provide is it would produce a low
12    tone.
13    Q.    And it would reduce the recoil?
14    A.    Yes.
15    Q.    Okay.  Did you personally yourself test fire any
16    of these to determine whether they muffled any of the
17    sound?
18    A.    No.
19    Q.    Did your expert, to your knowledge, test fire any of
20    these parts to determine whether or not they muffled any
21    of the sounds?
22    A.    No.  He didn't feel it was necessary because —
23    Q.    So the answer is no?
24    A.    No.
25    Q.    And when you were inspecting my client's shop, you
```

Agent Gary - Cross

1   didn't find any outer tubings.  Am I correct?

2   A.    There were tubes there, but it didn't look like

3   anything that could be attached to that readily.

4   Q.    Do you know anything about aluminum and aluminum

5   welding?

6   A.    Very basic knowledge.

7   Q.    Do you know anything about the fact — if I could

8   put this on.

9            THE COURT:  Do you want that on, Dave?

10           MR. BETRAS:  Yes, your Honor.  I am sorry.

11  BY MR. BETRAS

12  Q.    I think this is Government's Exhibit 1.  You would

13  agree with me that on either end of these there is no lip

14  to attach an outer tubing.

15  A.    I can't see if there is like an inside part that it

16  would be threaded or not.

17  Q.    I am talking about the outside, to slide over it.

18  A.    No.

19  Q.    There is no threading over here, correct?

20  (Indicating.)

21  A.    Correct.

22  Q.    And there is no threading up here, correct?

23  (Indicating.)

24  A.    Correct.

25  Q.    And do you know whether or not the machining is

Agent Gary - Cross

1   precise or imprecise?

2   A.   I do not.

3   Q.   Would it matter to you whether the machining of

4   these was precise or imprecise?

5   A.   No.

6   Q.   Do you understand, so you are not a machinist is

7   what you are saying?

8   A.   No.

9   Q.   And you wouldn't know how to even construct a tubing

10  to go on the outside of this, would you?

11  A.   I would imagine that there is a way to put a tube

12  over it.

13  Q.   Do you know for sure?

14  A.   No.

15  Q.   Okay.

16  A.   No.

17  Q.   You could put a potato over this, couldn't you?

18  A.   I guess you could.

19  Q.   You could put a pillow over that, couldn't you?

20  A.   Yes.

21  Q.   You could put a potato on the end of a gun, and that

22  would silence the sound, wouldn't it?

23  A.   Potentially.

24  Q.   You have seen examples where they have taken oil

25  cans and put them on the end of guns to silence the guns,

Agent Gary - Cross

1    correct?

2    A.    Yes.

3    Q.    My point is, it all goes to whether or not what's

4    the purpose or the intention of the person making

5    the part or what they intended it to be for,

6    correct?

7    A.    I am not sure what his intentions were.

8    Q.    Well, you do know some things of his intention,

9    officer.  That's not true.  You looked at his eBay

10   records, correct?

11   A.    Yes.

12   Q.    And you were able to tell the jury these were

13   marketed as muzzle brakes, correct?

14   A.    Yes.

15   Q.    All right.  So you know a little bit about his

16   intention then, and his intention, at least from the

17   records you examined, that they were being marketed as

18   muzzle brakes, correct?

19   A.    Correct.

20   Q.    All right.  So when you say you didn't know

21   any of his intention, that's not entirely accurate,

22   is it?

23   A.    Well, just from my experience, people that have

24   marketed things as such, you are not going to market

25   something as a silencer on eBay.  You are probably going

Agent Gary - Cross

1    to put something different.

2    Q.    How about, did you get into any of his e-mails where

3    he was giving me instructions on tubing, how to fashion a

4    tubing over this part.  You could tell the jury about

5    those e-mails, right?

6    A.    I don't recall any of those e-mails.

7    Q.    You don't recall any of those e-mails.

8              Is it possible or more probable you don't

9    recall any of those e-mails because none of those e-mails

10   exist, correct?

11   A.    I am not sure if they do exist.

12   Q.    Well, you got his computer, didn't you?

13   A.    Yes.

14   Q.    And you went through his computer, didn't you?

15   A.    We sent it to an expert who made a report of it.

16   Q.    All right.  And one of the things I am assuming

17   you told the expert to do is look for evidence to

18   see what this guy's intention was to make a silencer,

19   right?

20   A.    He did his own examination.  It wasn't really

21   directed on searching for anything in particular.

22   Q.    Well, wait a minute.  Wait a minute, officer.

23             You are investigating my client with the

24   allegation that it was his intention to make a silencer.

25   That's correct, isn't it?

Agent Gary - Cross

1    A.    Yes.

2    Q.    And you get a computer that potentially has evidence

3    on there to determine whether or not his intention was to

4    make a silencer, correct?

5    A.    Well, the possession of it —

6    Q.    You grabbed my client's computer, correct?

7    A.    Yes.

8    Q.    You didn't do nothing with it.  You sent it

9    somewhere, correct?

10   A.    Correct.  I also looked —

11   Q.    You sent it to whoever does your forensic analysis,

12   correct?

13   A.    Yes.

14   Q.    And you said "do nothing to them?  Here, have fun

15   with it"?

16   A.    They will do a general — I mean, they know what to

17   look for because they are affiliated with ATF.

18   Q.    Okay.  So they are affiliated with ATF, and your

19   position is, they know what to look for.

20               Tell the jury about the e-mails that you

21   found where my client is giving a person any instruction

22   on how to put a tubing over this muzzle brake.

23   A.    I don't believe that we viewed any of those

24   e-mails.

25   Q.    Because there weren't any, isn't that a fact?

Agent Gary - Cross

1    A.    I am not sure.

2    Q.    Well, if they were, we would be talking about them,

3    wouldn't we?  If you had evidence that my client was

4    giving instructions on how to put tubing over this,

5    you would be telling this jury about that, wouldn't

6    you?

7    A.    I didn't see those e-mails.

8    Q.    And you were not told of those e-mails, were you?

9    A.    Correct.

10   Q.    And when you talked to my client, he was shocked

11   about this, wasn't he?

12   A.    Yes.

13   Q.    Because he said "I am not making a silencer; I am

14   making a muzzle brake," right?  That's what he told you

15   at that point in time when you were at his shop.

16   A.    That's what he told me.

17   Q.    And he protested his innocence, didn't he?

18   A.    He wanted to — he wanted to find out why they were

19   considered silencers.

20   Q.    The point, officer, is what you were able to

21   ascertain and glean from my client is he didn't believe

22   that they were a silencer, and he didn't believe that

23   they were a silencer part based on your observations and

24   your conversations with him.  That's accurate for me to

25   say, isn't it?

Agent Gary - Cross

1    A.    I am not sure what his intentions were.

2    Q.    Okay.  How about what he said to you?

3    A.    He said that they were muzzle brakes.

4    Q.    And that he was — is it fair to say he was

5    incredulous, that you thought they were otherwise?  He

6    was shocked.

7    A.    He was shocked.

8    Q.    He was shocked that you thought he was making a

9    silencer, correct?

10   A.    Yes.

11   Q.    Now, do you remember the Government asking you

12   questions about all those eBay records?

13   A.    Yes.

14   Q.    And you have a book up there so we can take a look

15   at the same thing.  It is a white book.  Do you want to

16   go to Exhibit 31?  I just pulled out the first page just

17   as an example.

18            All right.  So let's go to item No. 55

19   there.  Do you see No. 55 there?

20   A.    Yes.

21   Q.    All right.  55, it says See n See Tool, that's from

22   him, correct?

23   A.    Yes.

24   Q.    And it is a Super Guilded Muzzle Brake, correct?

25   That's what it is advertised as, right?

Agent Gary - Cross

1   A.    Is it the one below the cursor?

2   Q.    Yeah.

3   A.    Yes. .22, 223 Caliber Super Guild Muzzle Brake with

4   14 side ports 1/2.

5   Q.    And it says "the total number available is five,"

6   correct.  If you go up to the top there, it says quantity

7   available, five, right there.  (Indicating.)

8   A.    Yes.

9   Q.    And that gives the price of it of $52, correct?

10  A.    Yes.

11  Q.    All right.  Now, you had said you were at my

12  client's — by the way, tell the jury where in the law it

13  says that my client has to get approval from the ATF

14  before he manufactures anything.

15          Can you tell us or tell the Judge or tell

16  the U.S. Attorney where in the law that is?

17  A.    In order to manufacture firearms or —

18  Q.    No, no.  You want to make issue of the fact that my

19  client didn't seek approval of you, correct, or approval

20  of the ATF?

21  A.    I am not trying to make issue of it.

22  Q.    Okay.  Let me ask you this:  You said that my client

23  sent you an e-mail, and that you told him to go seek

24  approval from the ATF, correct?

25  A.    Yes, because —

Agent Gary - Cross

1    Q.   All right.  Okay.

2              Now, if my client is not making a part that

3    is covered by the Federal Firearms Act, does he need to

4    seek approval of anyone?  He could just do it and would

5    be violate the law.  There is no preapproval process for

6    the ATF.

7    A.   If it is not covered under law as being a firearm or

8    silencer, then, no.

9    Q.   Okay.  And so if my client didn't feel that he was

10   making a part that was covered by the Federal Firearm

11   Act, there would be no need for him to seek approval,

12   correct?

13   A.   I urged him to do so, so he would —

14   Q.   I know you urged him to do so, but your answer to my

15   question was, if he felt that he was making something

16   covered by the Federal Firearm Act, he should have

17   gotten approval, and he didn't seek that approval,

18   correct?

19   A.   Correct.  He did not seek approval.

20   Q.   So the reverse of that is true, is at least evidence

21   that he didn't think or intend that he was making a part

22   that was covered by the Federal Firearm Act.  That's a

23   fact, correct?

24   A.   I am not sure what he was thinking.

25   Q.   We know you told him to seek approval, correct?

Agent Gary - Cross

1    A.    Correct.

2    Q.    And we know he only has to seek approval if he is

3    manufacturing something covered by the Federal Firearms

4    Act, correct?

5    A.    Correct.

6    Q.    And we know that he did not, in fact, contact the

7    ATF to find out whether or not these parts were permitted

8    or not, correct?

9    A.    Can you say that again?

10   Q.    I wished I could.  I know I get nervous.  Can you

11   repeat that?  (Directed to the reporter.)

12              THE REPORTER:  "Question:  And we know that

13   he did not, in fact, contact the ATF to find out whether

14   or not these parts were permitted or not, correct?"

15   A.    He later acknowledged that he did not, but I'm not

16   sure if he took steps to do so.

17   Q.    That doesn't answer my question.

18              The answer to the question is:  He did not

19   seek approval of the ATF, right?

20   A.    Correct.

21   Q.    And you have testified now that you don't have to

22   seek approval of the ATF if you are not making a firearm

23   part, correct?

24   A.    Yes.

25   Q.    All right.  So it would be logical to think if a

Agent Gary - Cross

1   person is not making a firearm part, that there is no
2   need to contact the FBI — I mean the ATF to seek
3   approval, correct?
4   A.    You wouldn't need to.  It would be recommended.
5   Q.    So my point I am trying to drive home, that is
6   certainly some evidence of his intention, wouldn't you
7   agree?
8   A.    It depends.
9   Q.    It depends?  Let me go now to another part or
10  exhibit.  This is Government's Exhibit 16.  Do you have
11  any idea what that is?
12  A.    It is some machine parts that have the description
13  of freeze plug forming in center fixture, mag light D
14  cell solvent trap tool.
15  Q.    Do you know, in fact, that's a part my client
16  manufactured for use in an automobile part?  This
17  neferious thing that you were told about was an
18  automobile part.  Do you know that?
19  A.    I am not sure.
20  Q.    But this was the part that raised someone's
21  suspicion, correct?
22  A.    Yes.
23  Q.    And that anonymous person, that anonymous person
24  happened to be my client's ex-wife.  Isn't that a
25  fact?

Agent Gary - Cross

1    A.    Yes.

2    Q.    And so my client's ex-wife contacted the FBI and

3    said "oh, my gosh, look at what my ex-husband is doing

4    here.  He is making auto parts," and that's when you went

5    out and saw these things here, correct?

6    A.    She contacted me with ATF.

7    Q.    Yeah.  And no one has told you that any of these

8    things are anything but 100 percent legal, correct?

9    A.    The lab has told me parts similar to this have been

10   used in the fabrication of silencers.  They will use

11   parts such as solvent, trap tools and mag light-type

12   devices to make silencers.

13   Q.    Right.  But you didn't find any evidence of that,

14   right?

15   A.    No.

16   Q.    So the testimony is correct, this Exhibit 4 — this

17   Exhibit 4, they said this is not a silencer, right, a

18   silencer part?

19   A.    Yes.  It was not classified as a silencer.

20   Q.    But this is a silencer part, correct?  (Indicating.)

21   A.    Yes.

22   Q.    And I guess I would have to ask your expert, is it

23   because these push the gas back, right?  I mean, the only

24   difference really in them is the way they are directing

25   the gases that come out of the firearm, correct?

Agent Gary - Cross

1    A.    I would have to defer to the expert.

2    Q.    Okay.

3              MR. BETRAS:  One second, your Honor.

4    BY MR. BETRAS

5    Q.    You would agree with me, would you not, that a

6    muzzle brake is not covered by the Federal Firearms Act,

7    correct?

8    A.    It would not be classified as a silencer.  So it

9    wouldn't be under the NFA, correct.

10   Q.    So the answer to my question is that a muzzle brake

11   is not a firearm, correct?

12   A.    Correct.

13   Q.    Have you gone on to the internet to look up

14   "muzzle brakes" yourself at all in your research of this

15   case?

16   A.    Just a little bit.

17   Q.    And is it fair for me to say you saw designs like

18   both of these designs for muzzle brakes?

19   A.    I haven't.  I'm just referring to what the experts

20   at FTB had told me.

21   Q.    I'm talking you yourself.  Have you gone to your

22   Google thing as an ATF agent and put in the word "muzzle

23   brake"?

24   A.    I have in the past.

25   Q.    And there are all kinds of designs, aren't

Agent Gary — Cross

1    there?

2    A.    Yes.

3    Q.    And a muzzle brake for the members of the jury, like

4    in a tank, on the end of a tank is a muzzle brake,

5    right?

6    A.    I don't know if it would be a muzzle brake or flash

7    suppresser.

8    Q.    But the point is, it is supposed to help the

9    recoil.

10   A.    Yeah.  That's the idea of a muzzle brake.

11   Q.    You were there when our expert Steve Howard test

12   fired the weapon, were you not?

13   A.    Yes.

14   Q.    And you witnessed the recoil with this muzzle brake

15   on it and without the muzzle brake on it.  You witnessed

16   that, did you not?

17   A.    I did.

18   Q.    And you could tell the jury that when this was on

19   the end of the rifle there was less recoil.  That's a

20   fact, correct?

21   A.    I would have to let him tell you that.  I am not

22   sure they measured how much it kicked back.

23   Q.    Well, you were there, officer.  You saw it,

24   correct?

25   A.    We provided the evidence.

Agent Gary - Cross

1   Q.   And you were there.  You saw him hanging the weapon.

2   Do you want me to show it to you?

3   A.   You can.

4            MR. BETRAS:  One second, your Honor.  Your

5   Honor, does the Court have the ability to play the CD?

6            THE COURT:  No.

7            MR. BETRAS:  That doesn't help much.

8   BY MR. BETRAS

9   Q.   Let me ask it this way:  Were you able to witness

10  the test fire?

11  A.   Yes.

12  Q.   Did you see when my client, when my expert Steve

13  Howard fired the weapon, that he had a yardstick on the

14  ground and a yardstick in the air, correct?

15  A.   Yes.

16  Q.   And you saw less recoil once he put one of these

17  devices on the end as opposed to when he did not.  Is

18  that fair?  That's a fair statement, right?

19  A.   I am not sure.  They videoed — they took video of

20  it to show how much it was swinging back.  The gun was

21  put on stings and showed how much it swung back after

22  being test fired.

23  Q.   Okay.

24           MR. BETRAS:  Thank you, your Honor.

25           THE COURT:  Anything further, Mr. Toepfer?

Agent Gary - Redirect

1        MR. TOEPFER:  Your Honor, can we approach

2    for a minute?  I think there is a matter we need to

3    discuss.

4        THE COURT:  Sure.

5        (Discussion held off the record.)

6        THE COURT:  Are you going to be very long?

7        MR. TOEPFER:  No, sir.

8        THE COURT:  I don't want to keep the jury

9    from lunch too long.

10       REDIRECT EXAMINATION

11   BY MR. TOEPFER

12   Q.   Agent Gary, this is not the first time you met

13   Mr. See, was it?

14   A.   No.

15   Q.   In fact, you previously investigated him for selling

16   and manufacturing silencers in the past?

17   A.   Yes.

18   Q.   In your prior investigation, did you buy silencers

19   through eBay from the Defendant?

20   A.   I purchased multiple silencers in an undercover

21   capacity through his eBay sales.

22   Q.   In the eBay records or the eBay sales he made of

23   those prior silencers, were they ever marketed as a

24   silencer?

25   A.   No.  They were called solvent traps, I believe.

Agent Gary - Redirect

1   Q.    And how many did you buy from him?

2   A.    Three or four.

3   Q.    Were those all through eBay?

4   A.    Yes.

5   Q.    Were any of those marketed as silencers?

6   A.    No.

7   Q.    You mentioned in your experience people would not

8   typically market something as a silencer or silencer

9   part.  Why not?

10  A.    You would immediately raise a red flag.

11  Q.    With whom?

12  A.    All the customers, eBay, whoever is the

13  administrator of the site.  They would probably not allow

14  you to sell items known as a silencer on eBay.

15            MR. TOEPFER:  Thank you, nothing further.

16            THE COURT:  Anything further based on that.

17            MR. BETRAS:  No.

18            THE COURT:  You may step down.  Let's take

19  our luncheon recess, and it is almost 12:30.  Let's meet

20  on L1 at 1:45, and that gives you an hour and 15 minutes.

21            As was mentioned earlier, you can go to the

22  lunchroom on 7 or go to Tower City, do what you want.

23  Keep in mind the admonition.  You heard some evidence.

24  You haven't heard it all.  You certainly don't know what

25  the law is that applies in the case.

Agent Gary - Redirect

1            Keep an open mind, and don't form or express

2    any opinion about the case.  You can't talk among

3    yourselves nor with anyone else.  If you do tell anybody,

4    as I said earlier, what you are doing, you can say you

5    have been selected as a juror.  Don't tell them what kind

6    of case it is or the nature of the case.

7            So enjoy lunch.  If you run into people,

8    too, that's the other thing, if they just say good

9    morning or good afternoon or whatever it is, you know

10   why, so a word to the wise.

11           So we will call for you at 1:45 where?  L1,

12   right, not up here.  See you then.

13                   (Luncheon recess taken.)

14                   - - - - -

15        *        *        *        *        *        *

16

17           MR. TOEPFER:  Your Honor, we will call

18   William Swift.

19           MR. BETRAS:  Your Honor, may we approach a

20   second?

21           THE COURT:  Sure.

22                   (Side bar discussion held off the record.)

23           THE COURT:  Sir, would you raise your right

24   hand for me?

25

Agent Swift - Direct

```
 1                     WILLIAM J. SWIFT
 2    called as a witness by and on behalf of the Government,
 3    being first duly sworn, was examined and testified
 4    as follows:
 5              THE COURT:  Tell us your full name, and
 6    spell your last name.
 7              THE DEFENDANT:  My name is William James
 8    Swift.  Last name is S-w-i-f-t.
 9              THE COURT:  Thank you.  Go ahead.
10                   DIRECT EXAMINATION
11    BY MR. TOEPFER
12    Q.   Sir, would you please tell us what you do for a
13    living?
14    A.   I am a firearms enforcement officer with the Bureau
15    of Alcohol, Tobacco, Firearms & Explosives.
16    Q.   And how long have you been with the ATF?
17    A.   Almost seven years.
18    Q.   What is a firearms enforcement officer?
19    A.   Firearms enforcement officer provides technical
20    information regarding the classification of firearms and
21    ammunition under federal law.
22    Q.   Before we get into that specific job, I would like
23    to start by talking about what you did before you joined
24    the ATF.
25              Did you ever serve in the military?
```

Agent Swift - Direct

1    A.    Yes, I did.  I served the United States Army as a

2    19 Delta Calvary scout for three years.

3    Q.    And what does a 19 Delta Calvary scout do?

4    A.    It is reconnaissance.

5    Q.    And tell us about one of the first jobs you had

6    after leaving the military.

7    A.    I worked in a machine shop, Accurate Machine & Tool

8    in Madison, Alabama, as a tool crib manager.

9    Q.    I'm sorry?

10   A.    As a tool crib manager.

11   Q.    What did they do in that shop?

12   A.    It was manufacturing.  They had manual CNC, lathes,

13   milling machines.

14   Q.    What were your duties there as a manager?

15   A.    I was responsible for accepting and transferring of

16   various tooling, including bar stock, drills, end mills,

17   carbide cutters, and the like.

18   Q.    And about how long were you there?

19   A.    Approximately six months.

20   Q.    What was the next job you had after that?

21   A.    I was a store manager of JCs Gun & Tackle located in

22   Huntsville, Alabama.

23   Q.    And what were your duties there?

24   A.    I was a primary purchaser for inventory and primary

25   seller of firearms.

Agent Swift - Direct

```
1    Q.    How long did you work at the gun store?

2    A.    Twelve years.

3    Q.    While you were working at the store, did you have

4    any experience in repairing firearms?

5    A.    Yes, I did.

6    Q.    Tell us about that.

7    A.    As a gun shop, we would take in guns that customers

8    needed to be repaired they were either disassembled, they

9    weren't working right, and we would repair them.

10   Q.    Did you have any experience machining parts for

11   guns?

12   A.    Yes.

13   Q.    Tell us about that.

14   A.    On occasion, say an old or antique firearm or

15   something that parts aren't available for, I would make

16   the parts to fit the firearm.

17   Q.    How often would you do that?

18   A.    Four or five times a month.

19   Q.    While working at the gun shop, were you going to

20   college as well?

21   A.    Yes.

22   Q.    And where did you go?

23   A.    Athens State, Alabama, and studied business

24   administration.

25   Q.    Did you get your degree?
```

Agent Swift – Direct

```
 1    A.    Yes, sir, I did.
 2    Q.    When did you get your degree?
 3    A.    2004.
 4    Q.    So let's talk now about your duties at ATF.  Give us
 5    more specific details what you do as a firearms
 6    enforcement officer.
 7    A.    Like I said earlier, we provide technical
 8    information where the Department of Justice and the
 9    Government's technical authority on what is a firearm and
10    what is not a firearm or how an item is or is not
11    regulated under federal firearms laws.  As duties as a
12    firearms enforcement officer we train special agents and
13    investigator at FLETC down in Glynco, Georgia, in
14    firearms, identification, and how they function.
15    Q.    Have you received any kind of specialized training
16    since joining the ATF?
17    A.    Yes, I have.
18    Q.    Have you received any training about firearms, how
19    they are made?
20    A.    Yes, I have.
21    Q.    Tell us about that.
22    A.    Part of the training and continual training of a
23    firearms enforcement officer is to know what a firearm is
24    under federal law, and with that, we tour various
25    manufacturing, firearms manufacturing facilities to see a
```

Agent Swift - Direct

1    piece of metal become a firearm and a regulated item

2    under federal law.

3    Q.    You said you toured factories.  Do you know about

4    how many you have toured?

5    A.    Nineteen.

6    Q.    Can you give us an example of some of the bigger

7    named manufacturers you visited?

8    A.    Smith & Wesson, Colt, Ruger, Savage, Mossberg, North

9    America Arms, LWRC.  There is a lot of them.

10   Q.    And what's the purpose of going to an onsite

11   manufacturer like that?

12   A.    You get the experience of seeing the firearm made,

13   and you get a historical perspective of the company;

14   also, with regard to how the firearm is made, what

15   firearms that company has made, and maybe the process has

16   changed over the years.  So if you saw one of those types

17   of firearms in my job, you would be able to determine it

18   is a firearm, who made it, when it was made, things like

19   that.

20   Q.    As part of your training, have you yourself had to

21   make a firearm?

22   A.    Yes.

23   Q.    Tell us about that.

24   A.    I have made an AR 15 type firearm receiver utilizing

25   a drill press and a milling machine.

Agent Swift - Direct

1  Q.   You mentioned earlier that part of your duties are

2  to conduct training courses for other agents, other law

3  enforcement officers.

4           Tell us about those courses and the kinds of

5  topics you discuss there.

6  A.   In the special agent portion of firearms training

7  that we give at ATF, it is more of firearms

8  identification, assembling and disassembling how a

9  machine gun functions, for instance, what a silencer is,

10  what a destructive device is, what is ammunition, what is

11  not, things like that.

12  Q.   Do you have any training related to the Gun Control

13  Act or the Federal Firearms Act?

14  A.   Yes.

15  Q.   What do you know about those?

16  A.   The Gun Control Act of 1968 was enacted to regulate

17  firearms where it required markings on firearms.  It

18  required you to be licensed, and as a person engaged in

19  the business of firearms, you could no longer mail order

20  through the gun and have a gun shipped to your house.

21  Q.   Are you familiar with the definition of "firearm"

22  under federal law?

23  A.   Yes, I am.

24  Q.   What is a firearm?

25  A.   A firearm under federal law found in 18 U.S. Code,

Agent Swift − Direct

1   Section 921, their definition is "any weapon which will

2   or is designed to or may readily be converted to expel a

3   projectile by the action of an explosive."  Its

4   definition includes "a firearm silencer, the frame or

5   receiver of a firearm, and a destructive device."

6   Q.   When you talk about "frame and receiver," are those

7   parts of a firearm?

8   A.   Yes.

9   Q.   And since we are talking about a firearm, are you

10  familiar with the definition of silencer under federal

11  law?

12  A.   Yes.

13  Q.   What is that?

14  A.   Again, under 921, the definition section, definition

15  No. 24 is "any device for silencing, diminishing,

16  muffling the report of a portable firearm, any

17  combination of parts designed or redesigned intended for

18  use in assembling or fabricating of a firearm silencer."

19  Q.   Does the definition then of a silencer include just

20  assembled devices or parts of those devices?

21  A.   The assembled device, a combination of parts from

22  which one can be assembled, and a third part I didn't

23  mention is any part used only in the assembly or

24  fabrication of a firearm silencer.

25  Q.   Now, have you had any experience in trying to

Agent Swift - Direct

1    stay current with case study, case law, things of that
2    nature?
3    A.    Yes, sir, I have.
4    Q.    Tell us how that is.
5    A.    In part of our training and how we make
6    classifications we stay up to date on current litigation,
7    lawsuits or court rulings, which might impact a possible
8    classification of things we are looking at.
9    Q.    Are you familiar with case studies involving
10   monolithic baffling?
11   A.    Yes.
12   Q.    Tell us about that.
13   A.    I am familiar with SIG Sauer versus Beta Jones.
14              MR. BETRAS:  Objection.
15              THE COURT:  Overruled.
16   Q.    Please continue.
17   A.    In this case, a SIG Sauer, a firearms manufacturer,
18   located in New Hampshire, submitted a firearm, a rifle
19   with a device welded to the muzzle.  ATF evaluated the
20   rifle and found it to be a monolithic baffle, a part used
21   in assembling or fabrication of a firearm silencer.
22   Q.    So how would that case affect you going forward in
23   classifying silencers or silencer parts?
24   A.    Well, after the appeal of SIG Sauer versus
25   Tom Brandon, the court held a monolithic baffle is a

Agent Swift - Direct

1    silencer part and, thus, a silencer.  We were instructed

2    by ATF counsel that if this item is seen with these

3    characteristics and design features, it would be

4    classified and should be classified as a firearm

5    silencer.

6                    MR. BETRAS:  Objection.  Move to strike,

7    your Honor.

8                    THE COURT:  Overruled.

9    BY MR. TOEPFER:

10   Q.    Officer Swift, have you in your experience at ATF

11   had an opportunity to inspect silencers or silencer parts

12   in the past?

13   A.    Yes, I have.

14   Q.    On approximately how many occasions have you done

15   that?

16   A.    Hundreds.

17   Q.    Are those part of your assigned duties at ATF?

18   A.    Yes, they are.

19   Q.    What's the process you go through in classifying

20   whether something is a silencer or silencer part?

21   A.    We look at the physical characteristics of the item,

22   note the physical dimensions of the item, and make a

23   comparison of that item, whether it is a part or

24   combination of parts or a whole device to a known

25   silencer or silencer part from our National Firearms

Agent Swift - Direct

1    Reference Collection.

2    Q.    What is the National Firearms Reference Collection?

3    A.    It is a working reference collection of over 14,000

4    firearms, which include silencers, machine guns, grenade

5    launchers, revolvers, pistols, and shotguns.

6    Q.    Where is that kept?

7    A.    In our office in Martinsburg, West Virginia.

8    Q.    If you have a part that comes in for examination,

9    would you test fire it?

10   A.    A part?

11   Q.    Yes.

12   A.    No.

13   Q.    Why not?

14   A.    Because a part in and of itself using assembly and

15   fabrication of a firearm silencer is a silencer.

16   Q.    So why can you get away with just doing then your

17   visual inspection?

18   A.    Definition of silencer includes a device for

19   silencing, diminishing, or muffling a report of a

20   portable firearm.

21   Q.    How many other firearms enforcement officers work

22   with you at ATF?

23   A.    Eleven others.

24   Q.    And the process that you've described for us about

25   how you inspect and classify firearms, silencers,

1    silencer parts, is that the same process that all the

2    other enforcement officers use?

3    A.    Yes.

4    Q.    Is that the accepted method that you use at the

5    Firearms Technology Branch?

6    A.    Yes.

7    Q.    Now, along those lines, does ATF ever respond to

8    inquires from the general public about the nature of

9    firearms, firearms parts?

10   A.    Yes, they do.

11   Q.    If somebody has a question about that, what would

12   they do?

13   A.    If they had a question regarding something is

14   regulated under federal firearms laws, they could write

15   our office and ask the question or call us, or they could

16   e-mail us and ask the question that way.

17   Q.    Are part of your duties responding to those

18   inquiries?

19   A.    Yes.

20   Q.    How often do you respond to questions of that

21   nature?

22   A.    Daily.

23   Q.    When a question like that comes in, does ATF keep a

24   record of the information?

25   A.    Yes, they do.

1  Q.   What information is recorded?

2  A.   They record the incoming inquiry and the response to

3  the individual or company.

4  Q.   Are those records made or kept at or about the time

5  those questions come in?

6  A.   Yes.

7  Q.   And at or about the time the answer goes out?

8  A.   Yes.

9  Q.   Is that something that is done in the ordinary

10  course of your business there at ATF?

11  A.   Yes, it is.

12  Q.   Where are those records maintained?

13  A.   In our office at Martinsburg, West Virginia.

14  Q.   Prior to coming in here today, did you have an

15  opportunity to look through those inquiries, to see if

16  you ever got one from somebody named Brent See?

17  A.   Yes, I did.

18  Q.   Did the Firearms Technology Branch ever get an

19  inquiry from somebody name Brent See about firearms,

20  firearms parts, silencers, or silencer parts?

21  A.   No.

22  Q.   Now, have you ever testified before as an expert in

23  the area of firearms?

24  A.   Yes, I have.

25  Q.   How many times have you been called in to testify?

Agent Swift - Direct

1    A.    Three others.

2    Q.    And more specifically have you ever been recognized

3    as an expert in classifying silencers?

4    A.    Yes, I have.

5    Q.    Where did that take place?

6    A.    Northern District of Georgia.

7    Q.    Have you ever been disqualified or not allowed to

8    testify?

9    A.    No, sir, I have not.

10   Q.    So let's talk a little bit more about silencers.

11   Tell us exactly what a silencer is.

12   A.    Well, it is a device, which you attach to the end

13   of a firearm barrel, which is designed to reduce the

14   sound or perceived sound that you hear once a shot is

15   fired.

16   Q.    Are silencers legal to own?

17   A.    Yes, they are.

18   Q.    How does somebody legally possess a silencer?

19   A.    There are a couple of ways:  You can either go to a

20   firearms gun shop, fill out an ATF Form 4, pay the $200

21   transfer tax, wait for that form to be processed with a

22   background check.  Once that background check comes back

23   and that form is approved, you can then take possession

24   of that firearm silencer.

25           Second way is, an individual can make one.

## Agent Swift - Direct

1   Same process, different form, you will have to fill out

2   an ATF Form 1, pay the $200 making tax, submit the form,

3   wait for that to come back with the approved form,

4   includes a background check.  Then you can make your

5   firearm silencer.

6   Q.    Did you bring examples of commercially available

7   silencers with you today?

8   A.    I did.

9   Q.    And would they be helpful in explaining your

10  testimony today?

11  A.    Yes.

12              MR. TOEPFER:  Your Honor, may I ask Officer

13  Swift to step down?

14              THE COURT:  Yes.

15  BY MR. TOEPFER:

16  Q.    Officer Swift, I will start by showing you

17  Government's Exhibit 33.  Can you tell us what that

18  is?

19  A.    This was an AAC, Advanced Armament Corporation,

20  firearm silencer that has been disassembled by ATF.

21  Q.    I notice there are two parts there.  Can you take

22  that apart, and tell us what we are looking at.

23  A.    In my left hand is the outer tube, which is designed

24  to cover over the monolithic baffling.

25  Q.    And then, also, I will show you Government's Exhibit

1    34 and ask you if you can tell us what we are looking at

2    here.

3    A.    This is a Gentech firearm silencer commercially

4    made.  This is an outer tube, a firearm silencer, a part,

5    silencer under federal law, and this is a monolithic

6    baffle, a part of the silencer.  The silencer is

7    regulated under federal law.

8    Q.    I notice we are looking at Exhibit 34, the tube

9    screwed on, and Exhibit 33 looks like it slides on and

10   off.

11                Does every silencer have to have a tube that

12   screws on to it?

13   A.    No.

14   Q.    Do the tubes have to be welded?

15   A.    No.

16   Q.    What are the different ways that tubes are attached

17   to these monolithic baffles?

18   A.    You can press fit an outer tube over the monolithic

19   baffle.  You could simply slide a tube or material such

20   as PVC, plumbing parts, a conduit, metal pipe.

21   Q.    Things you can find at Home Depot or any sort of

22   parts store?

23   A.    Yes, that's correct.

24   Q.    Office Swift, I want to talk about Exhibit 33 a

25   little bit more.

Agent Swift - Direct

1           Using it as an example, can you tell us how

2    a silencer works.

3    A.    Okay.  Well, this would be attached to the muzzle

4    firearm, this portion right here called the rear end cap

5    or rear portion of the firearm silencer.  Once a shot is

6    fired the expanding propellent gases, which are a result

7    of a gun shot, come out the muzzle of the barrel and are

8    slowed down by these metal fins or obstructions, and as

9    they are slowed down, they are cooled which reduces the

10   perceived sound of a gun shot.

11   Q.    Does a silencer actually make a gun completely

12   silent?

13   A.    No.

14   Q.    What does it?

15   A.    More technically correct is muffles or suppresses

16   the sound.

17   Q.    Can silencers act as something called a muzzle

18   brake?

19   A.    They can.  An incidental function of a firearm

20   silencer, as the gas comes out the barrel, it is slowed

21   down and dispersed.  So within about the first three

22   inches or so, it is going to cool rapidly and, thus,

23   reducing the felt recoil of the firearm, the kick you

24   feel when you shoot a rifle.

25   Q.    Along those lines, did you bring any examples of

Agent Swift - Direct

1    commercially available muzzle brakes to reduce recoil on

2    a gun?

3    A.   Yes.

4    Q.   I will show you Exhibits 35 and 36.  Let's start

5    with 35.  Tell us what you are looking at there.

6    A.   This is a muzzle brake.  This one is designed to be

7    attached to the muzzle just by clamping on the barrel, no

8    welding, no threading, no skill involved.  You see the

9    three fins right here or two fins on each side, same

10   process.

11              When the gun is fired, the hot expanding

12   gases and part of the pressure waive on that cartridge

13   being fired are immediately dispersed in front of the

14   barrel, generally within the first three inches.

15   Q.   Tell us about 36.

16   A.   Thirty six is a flash hider.  A flash hider is

17   attached, same principle, to the end of the barrel and so

18   designed with holes generally all the way around it to a

19   flash or the flash signature to be dispersed so the enemy

20   doesn't see where you are shooting from.

21   Q.   Now, as we talk about these muzzle brakes, I notice

22   that 35, which is a muzzle brake, is significantly

23   shorter than the monolithic baffling from Exhibit No. 33.

24   Fair statement?

25   A.   Yes.

Agent Swift - Direct

1    Q.    Why are muzzle brakes so much shorter than a

2    monolithic baffling?

3    A.    On a muzzle brake, you want that energy to be

4    dispersed as fast as you can to reproduce that felt

5    recoil of the firearm.  Generally, that's within the

6    first three inches.

7                  ATF specifically has conducted testing on

8    muzzle brakes and found within the first three inches

9    that's when most of the pressure wave and hot expanding

10   gases are dispersed.

11   Q.    So if you make something beyond that 3 or 4 inch

12   level, is it functioning at that point as an effective

13   muzzle brake?

14   A.    No, sir, it is not.

15   Q.    If it you had a big monolithic baffle like this

16   end of a gun would that serve as an effective muzzle

17   brake?

18   A.    No, sir, it would not.

19   Q.    Why not?

20   A.    Again, as the gas is coming out, about the first

21   three inches, all the gas has escaped.  They are not out

22   here any more with any amount.

23   Q.    Now, you mentioned that sometimes silencers can have

24   a secondary function of reducing recoil.  What's the only

25   way to turn a tall long monolithic baffle like this into

1    something that could effectively reduce the recoil of a

2    gun?

3    A.    In the case of an outer tube of some sort to trap,

4    slow those hot expanding gases.

5    Q.    Now, Officer Swift did you have a chance to examine

6    any evidence in this case?

7    A.    Yes, I did.

8    Q.    Generally speaking, what did you look at?

9    A.    Monolithic baffling, 194 of them.

10   Q.    Would you come with me, please?  I am going to show

11   you what previously has been marked for identification as

12   Government's Exhibits 1 through and including

13   Government's Exhibit 15.

14             Did you have a chance to look at these items

15   prior to coming into Court today?

16   A.    Yes, I did.

17   Q.    Are these the items you examined as part of your

18   investigation in this case?

19   A.    Yes, I did.

20   Q.    Why don't you have a seat, and we will go ahead and

21   talk further about this?

22             MR. TOEPFER:  Your Honor, may I have the

23   Elmo?

24             THE COURT:  You may.

25

Agent Swift - Direct

1    BY MR. TOEPFER

2    Q.    Officer Swift, I would like to show you Government's

3    Exhibits 1, 2, and 3.

4                    Again, these are items that you examined as

5    part of your preparation for this case.

6    A.    Yes, sir.

7    Q.    What are we looking at here?

8    A.    Looking at three monolithic silencer baffles.

9    Q.    What did you do with these when they first came into

10   your possession?

11   A.    I noted the physical dimensions of the items, and

12   then I made a comparison of these items to other

13   monolithic baffles and from the National Firearms

14   Collection.

15   Q.    In the process of doing that, did you form any

16   opinions about what these items are?

17   A.    Yes, I did.

18   Q.    And that was based upon what?

19   A.    A comparison of those items to known monolithic

20   baffles, silencers or baffles.

21   Q.    And what was your opinion?

22                    MR. BETRAS:  Objection, your Honor.

23                    THE COURT:  Overruled.

24   A.    These are firearm silencer monolithic baffles.

25   Q.    Now, would these items alone by themselves muffle

Agent Swift - Direct

1    any sound if they were attached to the end of a gun?

2    A.    No.

3    Q.    Why not?

4    A.    This is an internal part of a firearm silencer.  If

5    these items are designed to be encased by some outer body

6    or tube.

7    Q.    What would it take to make these functioning

8    devices?

9    A.    Some sort of outer tube such as PVC or cylindrical

10   pipe, some type of material slid over them.

11              MR. BETRAS:  Objection, your Honor.

12              THE COURT:  Overruled.

13   BY MR. TOEPFER:

14   Q.    Based on your experience working in the machine shop

15   and training at ATF, how would you attach a tube to any

16   one of these items?

17   A.    Well, you could have one press fit, you could have

18   one just slid over it and clamped with hose clamps, or

19   you could use some JB weld or caulking or some other

20   adhesive.

21   Q.    Okay.  Now, I would like to show you Government's

22   Exhibit No. 4, which is on the far right of your screen

23   right now.  Can you tell us what that is?

24   A.    That's a flash hider.

25   Q.    Was this something you considered to be a monolithic

Agent Swift - Direct

1  baffle?

2  A.    No.

3  Q.    Is Exhibit No. 4 a silencer part?

4  A.    No.

5  Q.    What makes Exhibit No. 4 different from the first

6  three we looked at that made you decide that's not a

7  silencer part?

8  A.    The machining of the holes in Exhibit 4 don't allow

9  the exhibit to be even encased in an outer body or tube

10  to incorporate areas of expansion of the hot expanding

11  gases.  This device is designed to allow immediate

12  release in front of the muzzle of all the hot expanding

13  gases once a shot is fired.

14  Q.    You talked earlier about these — we will call them

15  fins — that go up and down, for example, 1, 2 and 3.

16                Was the absence of fins on Exhibit No. 4

17  here, was that significant to you?

18  A.    It is significant, but it doesn't make the

19  classification.

20  Q.    And again, what's the purpose of the gaps between

21  the fins there?

22  A.    Those are to create areas of expansion to slowly

23  cool and trap hot expanding gases once a shot is fired

24  from a firearm.

25  Q.    Officer Swift, did you put together a series

Agent Swift - Direct

1    of photographs that detailed the other items we

2    have discussed so far today as you were inspecting

3    them?

4    A.    I did.

5    Q.    Would referring to those slides be helpful in

6    explaining your testimony?

7    A.    It would.

8    Q.    I would like to show you what has been marked, then,

9    as Government's Exhibit No. 30.  If we could have the

10   computer, please.  In this first slide, can you tell us

11   what we are looking at here?

12   A.    You are looking at an AAC, Advanced Armament

13   Corporation, model Titan firearm silencer.

14   Q.    And this is a commercially available silencer?

15   A.    Yes.

16   Q.    What do we see on page 2?

17   A.    Same item, just disassembled.

18   Q.    If you look at page 3, what does this show us?

19   A.    This is the rear of the monolithic baffle where it

20   would be attached to a firearm.

21   Q.    And where exactly would it get attached on there?

22   A.    At the rear portion right here.  (Indicating.)

23   Q.    Is that where it would screw on to the end of the

24   barrel?

25   A.    No.  This one is usually quick to attach, which is

1    generally incorporated into a flash hider.

2    Q.    And what is page 4 showing us there?

3    A.    This is the end of the front end cap where the

4    projectile comes out.

5    Q.    Page 5, what does this show?

6    A.    This is a Gemtech model GM 22 firearm silencer.

7    Q.    Again, it is another commercially available

8    silencer?

9    A.    Yes.

10   Q.    Page 6, what does this show?

11   A.    Same silencer, just disassembled.

12   Q.    I noticed the monolithic baffle here looks different

13   from the first one.  Is that common how silencers are

14   designed and built?

15   A.    Yes.  There is no one standard for the design of a

16   monolithic baffle, depending on the size and shape or the

17   size and caliber in a commercially available one to be

18   shot, say a .22, which is a .30 caliber or a larger

19   caliber, you would want to slow the gas.  As long as it

20   slows and cools the hot expanding gases, it is going to

21   do the job.  Some might do well, better than others.

22   Q.    Page 7, what's this showing us?

23   A.    The rear portion where it is internally threaded to

24   allow attachment to a portable firearm.

25   Q.    And then page 8?

Agent Swift - Direct

1   A.   This is the front.  This is where the bullet comes

2   out.

3   Q.   So now I would like to move on specifically to some

4   of the exhibits that you looked at related to this case.

5   We will start here, and when stuff comes through ATF, is

6   there a different number assigned to it?

7   A.   Yes.

8   Q.   Okay.  So this will be your ATF Exhibit 69, but it

9   is actually Government's Exhibit No. 5.  Can you tell us

10  what this is?

11  A.   This is a bag of monolithic firearm silencers,

12  baffles.

13  Q.   And if we go to page 10.

14  A.   This is 42 of them.  This is taken out of the

15  bag.

16  Q.   Page 11?

17  A.   This is an example showing the rear of each one of

18  them, which is internally threaded so it can be attached

19  to a portable firearm.

20  Q.   And page 12?

21  A.   This is an example photograph of the front, which

22  has a hole machine to allow a projectile to exit.

23  Q.   And what would it take to turn any one of those

24  items into a functioning silencer device?

25  A.   It wouldn't take much.  It would take some sort of

Agent Swift – Direct

1   outer tube as I described before placed over or encasing

2   the monolithic baffle.

3   Q.   Let's move on to Government's Exhibit 13, your

4   Exhibit 70, and can you tell us what this is?

5   A.   This is another bag of monolithic silencer baffle.

6   Q.   And page 14, what does this show?

7   A.   The same items, just displayed outside the bag.

8   Q.   Page 15?

9   A.   An example photograph showing the rear of these

10  devices, which is internally threaded and designed to be

11  attached to a firearm.

12  Q.   Page 16?

13  A.   Example photograph of the front, front end cap,

14  which has a hole machined into it to allow a projectile.

15  Q.   Okay.  This will be page 17.  This was your

16  Exhibit 71, but Government's Exhibit No. 7, what is this

17  showing?

18  A.   This is another bag of monolithic silencer baffles.

19  Q.   Page 18?

20  A.   This is an overall view of the same items outside of

21  the bag.

22  Q.   Page 19?

23  A.   This is an overall view of the rear portion, which

24  were each internally threaded to allow it to be attached

25  to a portable firearm.

Agent Swift - Direct

1    Q.    Page 20?

2    A.    This is a front view of the same items with the

3    holed machine in the front to allow exit of the bullet or

4    projectile.

5    Q.    Let's move on to page 21.  This is referring to your

6    ATF Exhibit 72 but would have been Government's Exhibit

7    No. 8.  What is this?

8    A.    This is another bag of monolithic silencer baffles.

9    Q.    Page 22?

10   A.    Same items displayed outside of the bag.

11   Q.    Page 23?

12   A.    A rearview of the internally threaded portion, which

13   allows that item to be attached to a firearm.

14   Q.    And page 24?

15   A.    The front view or view of the front portion of the

16   machine to allow a projectile to exit.

17   Q.    Page 25 refers to your Exhibit 73, and this

18   would have been Government's Exhibit No. 9.  What is

19   this?

20   A.    Another bag of monolithic silencer baffles.

21   Q.    Page 26?

22   A.    Same items, just outside of the bag.

23   Q.    Page 27?

24   A.    Example photograph showing the internally threaded

25   rear portion of these devices, which allows it to be

Agent Swift - Direct

1    attached to a portable firearm.

2    Q.    Page 28?

3    A.    Example photograph showing the holed machine through

4    the front portion to allow a projectile to escape.

5    Q.    Page 29, we are referring to your Exhibit 74, but

6    this would have been Government's Exhibit No. 10, what is

7    this?

8    A.    This is another bag of monolithic silencer baffles.

9    Q.    Page 30?

10   A.    Same baffles, just laid out outside of the bag.

11   Q.    Page 31?

12   A.    Same items depicting the internal threading at the

13   rear to allowed them to be attached to a portable

14   firearm.

15   Q.    Page 32?

16   A.    Photograph depicting the front portion, which has a

17   hole machined to allow the projectile or bullet to come

18   out of the flash.

19   Q.    There has been some issue in this case about whether

20   these are monolithic baffles that are silencer parts or

21   simply something called a muzzle brake.

22             Based on your experience and knowledge, are

23   any of the items we looked at so far with the exception

24   of Government's Exhibit 4, are any of those items muzzle

25   brakes?

Agent Swift - Direct

1   A.    No.

2   Q.    What are they?

3   A.    They are monolithic baffles for use in the silencer.

4   Q.    Why are you saying they are not muzzle brakes?

5   A.    Because each one of these 194 items is an internal

6   component of a firearm silencer, thus, a part of a

7   silencer, thus, a firearm silencer.

8   Q.    Let's move on to page 33.  This is your Exhibit 75,

9   Government's Exhibit 11.  What does that show?

10  A.    A bag of several items.

11  Q.    And if you look at page 34, what does this show?

12  A.    It shows 1, 2, 3, 4, 5, 6, 7 end caps, silencer end

13  caps.

14  Q.    Are those the items along the top there?

15  A.    Yes, sir.

16  Q.    What's an end cap?

17  A.    An end cap is something that would be at the front

18  or rear portion of the firearm silencer.  At the rear, it

19  is generally internally threaded or some type of

20  attachment point either it is quick detachable, a clamp.

21  It is generally referred to as an rear end cap or rear

22  portion.  Front end cap would be same type, same size

23  generally, which would have a hole in the machine for the

24  projectile to enter the device.

25  Q.    Page 35, what does this show?

Agent Swift - Direct

1    A.    Shows the seven end caps, and it shows five

2    monolithic baffles and a flash hider.

3    Q.    Which one are you saying is the flash hider?

4    A.    I have it identified as 75 M.

5            MR. TOEPFER:  Your Honor, may I approach?

6            THE COURT:  Sure.

7    BY MR. TOEPFER

8    Q.    Officer Swift, I just handed you what has been

9    marked for identification as Government's Exhibit 11 A.

10   Can you tell us what that is?

11   A.    This is a flash hider.

12   Q.    Did you determine that that is a silencer part?

13   A.    No, no.

14   Q.    Why is it not?

15   A.    It is not designed as an internal component of a

16   firearm silencer.  It is not designed to create any kind

17   of expansion chamber if anything were placed around the

18   item.

19   Q.    What are some of the distinguishing characteristics

20   between 11 A and the other items that we see pictured on

21   the screen here?

22   A.    The overall length of this item is substantially

23   shorter than the other items I evaluated.

24   Q.    Why is that significant to you?

25   A.    Generally, within the first three inches in front of

1    the muzzle, on a muzzle brake, the gas is redirected,

2    passed about three inches, an item is not as effective as

3    a muzzle brake.  So the extra length is generally not

4    necessary in the design of a muzzle brake.

5    Q.   If we keep looking at your slides here, page 36,

6    what does that show?

7    A.   The same items, just having the front showing the

8    machine hole for the projectile to escape.

9    Q.   Let's now look at page 37.  This was your Exhibit 77

10   but Government's Exhibit 12.  What does this show?

11   A.   Shows a bag containing a monolithic baffle and

12   another item which is threaded.

13   Q.   Look at page 38.  Are these the items outside the

14   bag?

15   A.   Yes, sir, they are.

16   Q.   What do we see here?

17   A.   Well, the item on the left is not a firearm silencer

18   and not an item regulated under federal law.  I found an

19   external threading of that item as compatible with the

20   internal threading of the 194 monolithic baffles.

21   Q.   Officer Swift, I have handed you Exhibits 12 and

22   12 A.  Tell us what you have there?

23   A.   I have one monolithic silencer baffle, which is

24   internally threaded at the rear, and you have essentially

25   a thread checker in my opinion is to check the machining

Agent Swift — Direct

1    of the threads at the rear portion of each one of these

2    194 devices.

3    Q.    Is it sort of a device to verify if the threading is

4    proper?

5    A.    Yes.  You can do that by simply screwing it on.

6    This thread pitch is half 28, which is a common thread

7    pitch found on an AR 15 thread type rifle and other type

8    of rifles.

9    Q.    Let's move to page 40 of your presentation here

10   showing your Exhibit No. 78, Government's Exhibit No. 13,

11   and then page 41, what does this show?

12   A.    A monolithic silencer baffle, the rear portion of it

13   highlighting the internal threads at the rear so it can

14   be attached to a portable firearm.

15   Q.    Page 42?

16   A.    Same item picking the front portion with the machine

17   hole, which allows the bullet or projectile to exit.

18   Q.    Page 43 refers to your Exhibit 79 but this would be

19   Government's Exhibit 14.  What does this show?

20   A.    This shows a monolithic silencer baffle.

21   Q.    Page 44?

22   A.    The rear internally threaded portion of the item.

23   Q.    And then page 45?

24   A.    The front portion of the item with a machine hole to

25   allow the projectile to escape.

Agent Swift - Direct

1  Q.   Now, it appears that this one had not been

2  completely machined yet.  Is that a fair statement?

3  A.   That's correct.

4  Q.   So why are you classifying this as a silencer part

5  if it is not completely machined yet?

6  A.   Based on the design features of the other numerous

7  monolithic baffles I evaluated, I determined that was a

8  part for and used in the assembly of a firearm silencer.

9  Thus, it is a silencer.

10  Q.   Page 46 shows your Exhibit 80, but this is

11  Government's Exhibit 15.  What does that show?

12  A.   It is a monolithic silencer baffle.

13  Q.   Page 47?

14  A.   An internally threaded portion.

15  Q.   And page 48?

16  A.   The front portion, the machine holed to allow the

17  projectile to exit.

18  Q.   And again, based on your training, experience, your

19  knowledge in this area, are any of those last items that

20  we talked about, would you consider any of those muzzle

21  brakes?

22  A.   No, sir, I would not.

23  Q.   Why not?

24  A.   Because these are all internal components of

25  a firearm silencer, monolithic firearm silencer

Agent Swift — Cross

1    baffles.

2              MR. TOEPFER:  May I have a moment, your

3    Honor.

4              THE COURT:  You may.

5              (Pause.)

6              MR. TOEPFER:  Thank you.  Nothing further.

7              THE COURT:  You may cross-examine.

8              MR. BETRAS:  Thank you.  Just give me a

9    moment, your Honor.

10             THE COURT:  Sure.

11                   CROSS EXAMINATION

12   BY MR. BETRAS:

13   Q.   So if I understand your testimony correctly, size

14   does matter with you then, correct?

15   A.   Sir?

16   Q.   I said size matters with you, right?

17   A.   Are you referring to the muzzle devices?

18   Q.   Yes, sir.

19   A.   Okay.

20   Q.   Size matters, right?

21   A.   Yes, sir.

22   Q.   So if it is over 3 inches, in your opinion, or is it

23   4 inches, it is not a muzzle brake; it is a silencer

24   part.  If it is under 4 inches, it is some other part.

25   Is that correct?

Agent Swift — Cross

```
1    A.    I didn't say four inches.  I said three inches.

2    Q.    Okay.  I will take your word for it.

3             Over three inches, it is part of a silencer;

4    under 3 inches, it is a muzzle brake.  That's your

5    testimony.

6    A.    Devices usually over three inches are ineffective as

7    a muzzle brake.

8    Q.    Say that again, officer.

9    A.    I said devises generally over three inches are

10   generally ineffective as a muzzle brake.

11   Q.    Have you ever heard of a concept called progressive

12   gas leaks?

13   A.    No.

14   Q.    You never heard of that concept?

15   A.    No, sir, I have not.

16   Q.    Is there a committee at the ATF that determines

17   whether something is a part of a silencer, or is that

18   just on you?

19   A.    There is no committee.  That's on each individual

20   firearms enforcement officer.

21   Q.    So you have an opinion that these parts that we saw

22   are part of a silencer because of two things:  One, their

23   size, correct?

24   A.    Yes, sir.

25   Q.    And the way they are redirecting the gas, correct?
```

Agent Swift - Cross

1    A.    That's correct.

2    Q.    All right.  And you wrote a report in this case,

3    correct?

4    A.    I did.

5    Q.    And your report basically reaches the same

6    conclusion on all these parts where you take a

7    measurement of them, correct?

8    A.    That's correct.

9    Q.    And you measure the width of them, correct?

10   A.    The diameter, yes, sir.

11   Q.    I'm sorry.  The diameter.  Now, I want to show

12   you Government's Exhibit 1, and so the jury understands,

13   if this was 3 inches long, your testimony would be

14   completely different than how long it is now, correct?

15   A.    Can you repeat the question?

16   Q.    If this were 3 inches long, you would not have the

17   opinion that it is a silencer, correct?

18   A.    Well, I haven't examined that item in a hypothetical

19   state as you are stating.

20   Q.    Well, let me ask you a hypothetical question.

21   Hypothetically speaking, of all these parts that you say

22   are silencer parts, if they were 3 inches or less, your

23   opinion would be that they are not silencer parts,

24   correct?

25   A.    Generally, yes.

Agent Swift — Cross

1   Q.   Okay.  So you are saying that a tube can be put over

2   this, correct?

3   A.   Yes.

4   Q.   And so the jury is clear, this thing alone by itself

5   silences no sound, correct?

6   A.   That's correct.

7   Q.   All right.  There has to be something you put over

8   this, correct?

9   A.   That's correct.

10  Q.   And according to your testimony, it is easy to put

11  something over on this, correct?

12  A.   Correct.

13  Q.   And if it is so easy to put a part over this, why —

14  strike that — you didn't bother to put a part over it

15  and test fire it, did you?

16  A.   No, sir, I didn't.

17  Q.   Okay.  You said, though, it is easy to do,

18  correct?

19  A.   That's correct.

20  Q.   And yet, you didn't do that?

21  A.   That's correct.

22  Q.   Do you know what these are made out of, the type of

23  metal they are?

24  A.   There were some that appeared to be an aluminum

25  type.

Agent Swift — Cross

1    Q.    Any significance between aluminum and reinforced

2    steel?

3    A.    And there were some items that appeared to be of a

4    ferrous type metal.

5    Q.    Any significance of it being aluminum as opposed to

6    reinforced steel or titanium?

7    A.    With regard to my classification, no.

8    Q.    You could put a potato over that, right?

9    A.    I'm sorry?

10   Q.    I could put a pillow over this and muffle the sound,

11   correct?

12   A.    Yes.

13   Q.    I could get one of those big potatoes they have at

14   these big steak houses here and drill a hole in the

15   potato, I could stick this in the potato, right?

16   A.    You could.

17   Q.    And that would muffle the sound, right?

18   A.    Possibly, yes.

19   Q.    But your thing is that a tube like this goes over

20   it, correct?

21   A.    Yes.

22   Q.    All right.  And I noticed you had this one, too,

23   correct?  Can I approach the witness, your Honor?

24             THE COURT:  Sure.

25

Agent Swift – Cross

```
 1   BY MR. BETRAS:
 2   Q.   I want you to look at — I want you to look at
 3   Exhibit 34 and Exhibit 33 for me.  Would you take a
 4   look at those?  You clearly said those are silencers,
 5   right?
 6   A.   Yes.
 7   Q.   And each one of those has a lip on them, do they
 8   not?
 9   A.   Lip.  What do you mean by lip?
10   Q.   This little thing here where it screws on.
11   A.   The raised area?
12   Q.   Shoulder.  Is that what it is?  That one has a
13   shoulder, right?
14   A.   Yes.
15   Q.   And this one has a shoulder, correct?
16   A.   Yes.
17   Q.   But the Government's Exhibit whatever and all the
18   ones you examined, none of those have a shoulder, do
19   they?
20   A.   No, sir, they don't.
21   Q.   Not one of them, correct?
22   A.   That's correct.
23   Q.   And you would agree with me that you can't
24   accidentally make a silencer.  You have to intend to make
25   a silencer, right, or is it your testimony you can
```

1    accidentally do this and violate the law?  You have to

2    intend to violate the law, right?

3    A.    No.  You can make an item.

4    Q.    My question is, so your testimony to the jury is,

5    you can accidentally make a silencer?

6    A.    I am not saying you can make — accidentally make a

7    silencer.  You can make an item that may incorporate

8    firearm silencer characteristics.

9    Q.    Okay.  All right.  I will go with that.  So

10   something has to go over this, correct?

11   A.    Yes.

12   Q.    Now, when I asked you, is there a committee, you

13   said there is no committee, correct?  It is just you and

14   some other guys there?

15   A.    That's correct.

16   Q.    And is there any peer review article that you review

17   to determine whether or not these would be considered

18   silencers as opposed to not silencers?

19   A.    We reviewed the outcome and summary judgment of

20   SIG versus Beta Jones and the appeal of SIG Sauer —

21   Q.    I'm so glad you mentioned that case.

22              Isn't it a fact, officer, that in that case,

23   in that SIG Sauer case, that they had a lip or a shoulder

24   on that part, correct?

25   A.    I would have to review the item to know that.

1    Q.    You were talking about how knowledgeable you were

2    with the SIG Sauer case, and now you are saying you are

3    not that knowledgeable of it?

4    A.    I didn't say that.

5    Q.    All right.  So once again, I am going to ask you,

6    isn't it a fact that in the SIG Sauer case there was a

7    lip or a shoulder on that silencer part that you are

8    relying on?

9    A.    I would have to review that item to determine

10   that.

11   Q.    Well, did you review that item before you made your

12   opinion that these are silencers?

13   A.    Yes, I did.

14   Q.    You reviewed that case?

15   A.    Yes.

16   Q.    Well, if you reviewed the case, then you should know

17   whether or not that firearm in that SIG Sauer case that

18   you are relying on had a lip or a shoulder on it?

19   A.    I don't understand your question, sir.

20   Q.    Okay.  Let's go back.

21          I was asking you the significance of there

22   being no shoulder or lip —

23   A.    Okay.

24   Q.    — on this muzzle brake as compared to this

25   Government's Exhibit 33 and Government's Exhibit 34.

Agent Swift - Cross

1    A.    Okay.

2    Q.    Which both have either a screw on or some kind of a

3    lip that the tubing goes on?

4    A.    Okay.

5    Q.    Do you understand?

6    A.    Yes, sir.

7    Q.    And so my question to you is, you were saying that

8    the SIG Sauer case is sort of your guide as to whether

9    something is a silencer part or whether it is something

10   else, correct?

11   A.    Right.

12   Q.    And I am asking you, the firearm that was used in

13   the SIG Sauer case, isn't it a fact that that firearm

14   contained this either lip or that screw on, that case and

15   the firearm in this case had that lip as opposed to here

16   where there is no lip, correct?

17   A.    Correct.

18   Q.    All right.  So the case you are relying on saying

19   that this is violating federal law had a lip or a

20   shoulder, and the item that was seized from my client had

21   no shoulder, correct?

22   A.    That's correct.

23   Q.    All right.  And so your testimony is that you could

24   put a tube over this, and it would muffle the sound,

25   correct?

Agent Swift — Cross

1    A.    That's correct.

2    Q.    And you could take a potato and put it over this and

3    muffle the sound, correct?

4    A.    That's correct.

5    Q.    So you could take a pillow on the end of a gun and

6    make a silencer, correct?

7    A.    Yes, sir, that's correct.

8    Q.    All right.  So in order for this, you would have to

9    affix the tubing over the monolithic baffler for that to

10   be an operating silencer, correct?

11   A.    Correct.

12   Q.    Now, there is no threading on this part that goes

13   into the gun, correct?

14   A.    That's correct.

15   Q.    So the only way you could attach — let me ask you

16   this:  Is it significant to you that these are machined

17   imprecisely?

18   A.    What do you mean "imprecisely," sir?

19   Q.    Are these precisely machined, the diameter?  Are

20   they precisely machined?

21   A.    To what diameter?

22   Q.    Well, I am asking you.  Are they precisely machined?

23   Do you know they are precisely machined, or you don't

24   know they are precisely machined?

25   A.    Well, what is your definition of "precisely"?

1   Q.   Well, did you examine all of these parts here?  You

2   examined all of those, correct?

3   A.   That's correct.

4   Q.   Okay.

5   A.   Are you saying they are completely machined and

6   finished?  Is that what you are asking me?

7   Q.   That's my question.  Are they finally machined so a

8   tube can go over it?

9   A.   Yes.

10  Q.   That's your opinion?

11  A.   Yes.

12  Q.   Okay.  You put no meter on these, correct, no — you

13  have a meter that measures microscopically or to the

14  minutest degree the diameter?

15  A.   No, sir.  I used a dial caliper.

16  Q.   And did you use a dial caliper on all of them?

17  A.   Yes.

18  Q.   And did you use the dial caliper up and down the

19  shaft, or did you just pick a spot?

20  A.   No.  I made two measurements, at the front and the

21  rear.

22  Q.   Okay.  So if it is imprecisely machined putting a

23  tube on it, it could blow the tube off, no?

24  A.   No.

25  Q.   Your opinion is that if you put a tube over this and

Agent Swift — Cross

1    didn't fasten it in some way, that that tube is not going
2    to blow off?
3    A.   Well, there are different ways of attaching a tube
4    to it.  As I said earlier, a press fitment, which would
5    be a tube, a little smaller diameter than that device
6    there, and so it would be secured by tension or press
7    fitment.
8    Q.   Hence, my question of the precise machine:
9              In order for it to be a snug fit, they would
10   need to be machined together in order to have the fit
11   that would properly muffle the sound, correct?
12   A.   No, because a firearm silencer doesn't actually have
13   to work or work well to be classified as a firearm
14   silencer.
15   Q.   It doesn't have to work or work well to be a firearm
16   silencer, correct?
17   A.   That's correct.
18   Q.   All right.  One second.
19             You said you could press fit the tube on
20   this.
21   A.   Yes.
22   Q.   Would that press fit ruin the flanges?
23   A.   No.
24   Q.   It would not?
25   A.   No.

Agent Swift — Cross

1  Q.   Did anyone show you the experiment that Steve Howard

2  ran on these?

3  A.   I witnessed his testing of that, yes.

4  Q.   Okay.  And when you witnessed his testing, you saw

5  that the recoil from the firearm was greatly reduced once

6  these were attached, correct?

7  A.   I believe without that device on it, it was 21

8  inches, and with that device was 11 inches.

9  Q.   So it reduced the recoil?

10  A.   Yes.

11  Q.   Okay.  And you would agree with me that by shear

12  definition a muzzle brake design is to reduce the recoil?

13  A.   A muzzle brake is designed to reduce the recoil,

14  yes.

15  Q.   Okay.  And these reduced the recoil, did they

16  not?

17  A.   Yes, they did.

18  Q.   Okay.  Do you have any training in welding?

19  A.   No, sir, I don't.

20  Q.   Are you able to testify to any degree of certainty

21  about — or would you be able to weld aluminum on to

22  aluminum?

23  A.   No, sir, I don't.

24  Q.   Okay.  And if you press fit it, you have an opinion,

25  do you not, that if those — that gun could explode, can

1   it not, if it is not properly fit?

2   A.    Are you talking the gun can explode?

3   Q.    The projectile coming out of the gun.

4   A.    No.  Not with a press fitment, no.

5   Q.    It wouldn't explode?

6   A.    No, sir.

7   Q.    It would just come out?

8   A.    Yes, sir.

9   Q.    And how would you press fit it?

10  A.    Well, you take something like PVC, plastic type

11  material would slide right over that.  Aluminum versus

12  plastic would not damage those fins.

13  Q.    What's going to prevent the tubing from flying off

14  if it is not attached to the muzzle brake?

15  A.    Well, you can attach it in several different ways.

16  You can use tape.  You can use JB weld, have epoxy,

17  adhesive, caulking, hose clamps, several different

18  ways.

19  Q.    When I use the word "psi," what does that mean to

20  you?

21  A.    It is a unit of pressure.

22  Q.    And when a projectile is coming out of an AR 15, at

23  what psi do you know it comes out the end of that?

24  A.    I don't know that measurement, sir.

25  Q.    You do not know that?

1    A.    No.

2    Q.    Because if you knew that, if I told you it is 65,000

3    psi per square inch of force, you don't think tape is

4    going to hold that covering on, do you?

5    A.    I don't know if it would or not.

6    Q.    You can't testify to that.

7    A.    No, sir.

8    Q.    And how many cases have you testified in regarding

9    silencers in federal court?

10   A.    One.

11   Q.    One?

12   A.    Yes, sir.

13   Q.    Oh.  So you have done this one other time before?

14   A.    That's correct.

15   Q.    Correct.  So you are sitting at your office — is it

16   in Virginia?

17   A.    West Virginia.

18   Q.    West Virginia.  They like guns in West Virginia,

19   right?  You are sitting in your office in West Virginia

20   and in comes this.  You take out your little measurement

21   thing, you measure them, right?

22   A.    Yes, sir.

23   Q.    You measure their length and their diameter.

24   And you come to the opinion, uh huh, this looks

25   like, it resembles other silencers that I have seen,

Agent Swift — Cross

1    correct?

2    A.    That's correct.

3    Q.    And as a matter of fact, in your report, you say it

4    appears similar to other firearm silencer parts I have

5    observed, correct?

6    A.    That's correct.

7    Q.    And your testimony is you could take a tube and put

8    it on there and even though that's easy to do, you never

9    did that?

10   A.    That's correct.

11   Q.    You wouldn't know if that would work or not work?

12   A.    It would work.

13   Q.    It would work?

14   A.    Yes, sir.

15   Q.    Easily work?

16   A.    Yes, sir.

17   Q.    So easily that you took time to do it, right?

18   A.    I did not do that.

19   Q.    When you worked at the machine shop, did you

20   actually do machining, or were you just managing

21   it?

22   A.    I was a tool crib manager.  No, I did no manual

23   machining or CNC machining, no, sir.

24   Q.    I didn't hear what you said.

25   A.    I did not do any machining while I was there, no,

Agent Swift - Cross

1    sir.

2    Q.    You did no machining.

3              And I noticed on the one, I want to go to —

4              MR. BETRAS:  Can you turn on the Elmo, your

5    Honor?

6              THE COURT:  Sure.

7              MR. BETRAS:  Thank you very much, your

8    Honor.

9    BY MR. BETRAS:

10   Q.    — I noticed in your direct examination that you

11   even said this one was a silencer, correct?

12   A.    That's correct.

13   Q.    It is not even finished, is it?

14   A.    That's right.

15   Q.    And it is warped, isn't it?

16   A.    No, it is not warped.

17   Q.    It is twisted?

18   A.    That's the way it was machined, sir.

19   Q.    An unfinished part that was machined twisted in your

20   opinion is a silencer part, even though that's even

21   functioning.  That's your opinion to this jury?

22   A.    Whether a part is finished or not, this device, this

23   part incorporates the design features of the other 193

24   that I classified as firearms silencers.

25   Q.    And I am going to show you another picture that you

Agent Swift – Cross

1  classified, you see these items right up here?

2  A.    Yes, sir.

3  Q.    Do you know what those are?

4  A.    Those appear to be front end caps of a firearm

5  silencer.

6  Q.    How about they are a part for an engine block.

7  Do you know if my client was doing work for engine

8  blocks?

9  A.    No.

10  Q.    You wouldn't know that because you are not a

11  machinist?

12  A.    I didn't know his occupation.

13  Q.    You didn't know he was a machinist?

14  A.    I don't know.  I didn't know he was a mechanic.

15  Q.    Do machinists machine parts for automobiles?

16  A.    I guess it is possible they could, sir, yes.

17  Q.    You would agree with me that if a part is a muzzle

18  brake, that it is not a firearm, correct?

19  A.    As long as it doesn't have design features of a

20  firearm silencer.  Then no, it would not be.

21  Q.    Okay.  So hypothetically — and you disagree with

22  me, I get it — but hypothetically, if these were muzzle

23  brakes, even though you don't think they are, if they

24  were three inches instead of how big they are, in your

25  opinion, they would be muzzle brakes and not a firearm or

Agent Swift — Cross

1    a firearm part?

2    A.    Generally, at that length, they would not

3    incorporate firearm silencer features.

4    Q.    Now, in your report — so I want to make sure I

5    understand this.

6              Is it your testimony that over three inches

7    the gas, it doesn't matter about the expanding gas to act

8    as a muzzle brake?

9    A.    Well, the device wouldn't be effective past that

10   because in the first three inches most of the gas has

11   already been redirected in front of the muzzle.

12   Q.    Most of the gas but not all of it?

13   A.    That's correct.

14   Q.    So there is still some gas coming out even at the

15   length of these parts, correct?

16   A.    That's correct.

17   Q.    And even gas coming out will cause a recoil,

18   correct.  Gas coming out of that firearm is going to

19   cause a recoil?

20   A.    Generally, yes.

21   Q.    So the longer you can make the gas to be recoiled,

22   the less of a recoil — strike that.  I am confusing

23   myself.

24             The longer you can expand the gas coming out

25   of the firearm, the less of a recoil you are going to get

1    from that firearm, correct?

2    A.    If it is past three inches, it is going to be

3    greatly diminished.

4    Q.    It is going to be diminished, but there is

5    still some gas coming out that will cause a recoil,

6    correct?

7    A.    Cause it to reduce recoil or recoil?

8    Q.    Both.

9    A.    I am not sure I understand that question.  Can you

10   repeat that?

11   Q.    All right.  You said that past three inches, it

12   is minimal, the gas and the recoil is minimized greatly

13   in the first three inches.  You testified to that,

14   correct?

15   A.    Yes.

16   Q.    All right.  But your testimony is also, is it not,

17   that even past three inches there is still gas coming

18   out, correct?

19   A.    Yes.

20   Q.    And if you could design something to even

21   incorporate that gas, that would cause a reduction in the

22   recoil even further, would it not?

23   A.    Possibly.  That's generally a feature found in

24   firearms silencers.

25   Q.    Okay.  Now, in exhibit — I forget which, it is your

Agent Swift — Cross

1   Exhibit 79, right?

2   A.   That's correct.

3   Q.   Nothing has been done to that.  It is just a

4   piece of tube, right?  It hasn't been machined at all,

5   right?

6   A.   I believe that's been machined on the other side of

7   it.  Has that not been machined?

8   Q.   Well, it just looks like a solid tube to me, solid

9   piece of metal.

10  A.   Do you have that exhibit here I could take a look

11  at?

12  Q.   Sure.

13              MR. BETRAS:  May I approach, your Honor?

14              THE COURT:  You may.

15              MR. BETRAS:  You have a book up there.  Can

16  I find it?

17              THE COURT:  I think he wants the actual

18  item.

19  BY MR. BETRAS:

20  Q.   Do you have this?  This one is not even done, is it?

21  A.   It is not completed, no, sir.

22  Q.   And even in light of that, you still said, oh, yeah,

23  that's a silencer?

24  A.   Yes, sir, I did.

25  Q.   Even though it is not done?

Agent Swift — Cross

```
 1    A.    That's correct.
 2    Q.    I wanted to thank you for your service by the way in
 3    the Army.
 4    A.    Thank you.
 5              MR. BETRAS:  Just a couple more questions.
 6              (Pause.)
 7    BY MR. BETRAS
 8    Q.    I want you to grab — there is a black binder up
 9    there, sir.  I want you to go to Defendant's Exhibit E 4.
10    I just want to point out one thing to you that you
11    repeated a lot.
12    A.    Okay.
13    Q.    And it says there — and follow with me "as a
14    result, Exhibit 67 is a part used only in the assembly or
15    fabrication of a firearm silencer."  In other words.
16    That's its only use?  That's what you wrote there,
17    correct?
18    A.    Yes.  Can I look at Exhibit 67?
19    Q.    Just so you know, that passage is repeated in every
20    one of your analysis?
21    A.    Yes, sir.  I just want to verify what I am talking
22    about.
23    Q.    I am not trying to mislead you, but you examined
24    each one of these individually, correct?
25    A.    Correct.
```

Agent Swift - Cross

1    Q.    And then you wrote a report?

2    A.    Yes.

3    Q.    And that sentence is on each one of them, so I could

4    show you any one of them, correct?  You would agree with

5    me —

6    A.    Not that I don't trust you, I just want to see

7    Exhibit 67.

8    Q.    Well, let's go to one that we can find.  This is

9    Exhibit 3.  Can you take a look at Exhibit 3?

10   A.    Yes, I did.

11   Q.    Okay.  And that same sentence used in Exhibit 3 as

12   it is used in Exhibit 67, correct?

13   A.    Yes.

14   Q.    And that sentence is "only used in the assembly or

15   fabrication of a firearm silencer"?

16   A.    Yes, sir.

17   Q.    Well, that's not accurate, right, because you at

18   least saw my — I mean our expert do the recoil test, and

19   you saw that it greatly reduced the recoil.

20   A.    That's a secondary function of this device.

21   Q.    In your opinion.

22   A.    Yes, sir, in my opinion.

23   Q.    Okay.  And I will leave you with this:  There is no

24   book that you go to of peer-reviewed articles that

25   determines, that makes the determination that this is a

Agent Swift — Cross

1   silencer or not.  This is based on your testimony,

2   correct?

3   A.   Based on the definition given federal law and the

4   Gun Control Act what a silencer is.

5   Q.   Okay.  I will take that.

6           But there is no articles or generally

7   accepted book that you can go to and say, yep, nope.  You

8   are making those calls based on your opinion?

9   A.   Yes, sir.

10  Q.   And your observation.

11  A.   Yes, sir.

12  Q.   Okay.  And basically, because these are over three

13  inches, that's what made you say these are silencer

14  parts, correct?

15  A.   That's correct.

16  Q.   Regardless of what my client may or may not have

17  intended?

18  A.   That's correct.

19          MR. BETRAS:  Okay.  One second.

20          (Pause.)

21  Q.   One last question:  When that gun was test fired by

22  Mr. Howard with these devices on the end of it and with

23  the devices not on the end of it, isn't it a fact that

24  the sound was louder with these devices on as opposed to

25  without?

Agent Swift – Redirect

1    A.    Oh, yes, it was, because as the operator, when the

2    shot is fired, these metal fins redirect the pressure

3    wings back to the operator or the shooter.

4    Q.    Okay.  So the testimony is clear, when you put this

5    on the firearm, it made it louder, not quieter?

6    A.    When I observed Mr. Howard test fire it, yes.

7              MR. BETRAS:  Okay.  No further questions.

8              THE COURT:  Anything?

9              MR. TOEPFER:  Yes, your Honor.

10                  REDIRECT EXAMINATION

11   BY MR. TOEPFER

12   Q.    Officer Swift, you were asked about whether you put

13   a tube over one of these items and test fired it.  Why

14   didn't you do that?

15   A.    Because ATF has determined that items with these

16   physical characteristics, design features is a monolithic

17   silencer baffle.

18   Q.    So test firing it or putting a tube on it wouldn't

19   have affected your opinion in any way?

20   A.    No, sir.

21   Q.    You were asked about the absence of a shoulder or

22   lip on one of these items.  Is that significant to you at

23   all?

24   A.    No, sir.

25   Q.    Why not?

Agent Swift — Redirect

1    A.    Because that's more of a feature of an attachment

2    point.  As long as there is some kind of body or tube

3    that contains those gases how it is attached, whether it

4    works once or a hundred times doesn't matter.

5    Q.    Could a tube be attached to it without a shoulder?

6    A.    Yes.

7    Q.    You were asked about this test fire and the fact it

8    appeared to be louder.  Again does that affect your

9    opinion at all?

10   A.    No.

11   Q.    Why not?

12   A.    Because these parts, the 194 parts I examined

13   classified as firearm silencers are internal components

14   for firearm silencer monolithic baffles.

15   Q.    Would you expect a monolithic baffle by itself to

16   ever reduce the noise?

17   A.    No, sir.

18   Q.    Would it only do that if there is a tube attached to

19   it?

20   A.    That's correct.

21   Q.    And I know Mr. Betras asked you how many times you

22   have been actually called in to testify.  You said it was

23   only once?

24   A.    Yes.

25   Q.    Is it fair to say you are not always called

1    to testify when you do an examination.  Is that

2    correct?

3    A.    That's correct.

4    Q.    How many times have you examined a firearm or

5    silencer in your career?

6    A.    Thousands.

7    Q.    Thousands.  And obviously, you have not been called

8    to testify a thousand times.

9    A.    No, sir, I have not.

10   Q.    We talked a little bit as well about the length of

11   these various items.  Why is that significant to you?

12   A.    Because past approximately three inches, when a gun

13   is fired, that pressure wave, the hot expanding gases is

14   immediately dissipated on an item that is designed as a

15   muzzle brake.  Adding length to it is not going to

16   further dissipate it.  Most of that gas is ejected or

17   redirected immediately in front of the muzzle.

18   Q.    What is the purpose, then, of making something

19   longer with additional fins on it like some of the items

20   we have seen here?

21   A.    It is to make a monolithic baffle in the operation

22   of a firearm silencer.

23   Q.    I know Mr. Betras asked you about pillows and

24   potatoes.  Would it be fair to say potatoes have

25   other uses besides being turned into a firearm

Agent Swift - Recross

1    silencer?

2    A.    Yes.

3    Q.    Same thing for pillows, right?

4    A.    That's correct.

5    Q.    What is the purpose of a monolithic baffle?

6    A.    It is to slow and cool the hot expanding gases once

7    a shot is fired.  The more effective it can do that,

8    generally the quieter it is going to make the perceived

9    sound of that firearm be.

10   Q.    Does a monolithic baffle of the kind and length that

11   we have talked about here today serve any other purpose

12   than what you just described?

13   A.    No, sir.

14              MR. TOEPFER:  Thank you.  Nothing further.

15              THE COURT:  Anything.

16              MR. BETRAS:  Yes.

17                 RECROSS EXAMINATION

18   BY MR. BETRAS:

19   Q.    Were you given any tubes to examine in your

20   examination of this case?

21   A.    No, sir.

22   Q.    And I asked you — and I want to make sure — you

23   do not know the psi of a bullet exiting a firearm, do

24   you?

25   A.    Well, now that you told me, I do know.

1    Q.    65,000, right?

2    A.    That sounds about right.

3    Q.    Have you ever filled up the tire in your car?

4    A.    I have added air to it.  I haven't filled one up.

5    Q.    And they have about 30 psis, right?

6    A.    Generally, right.

7    Q.    So just to give the jury some perspective

8    65,000 psis is a lot of pressure and a lot of gas, is

9    it not?

10   A.    Yes.

11   Q.    And the U.S. Attorney asked you about a test fire.

12   Hypothetically, if you put a tube over one of these and

13   fired it and it exploded, that would not be a silencer,

14   would it, if it exploded?

15   A.    No.  That would be incorrect.  The classification is

16   not made on whether the item works or doesn't work,

17   whether it has design features, and by you putting that

18   tube hypothetically over any of those items, you would be

19   making a firearm silencer.

20   Q.    Okay.  And just so the record is clear, you were not

21   given any tubes to examine to see this, correct?

22   A.    That's correct.

23   Q.    And you weren't told of anyone asking for a tube to

24   be put over this, correct?

25   A.    No, sir.

Agent Swift — Recross

1  Q.    And so just because it could be done, therefore,
2  that's the essence of your opinion?
3  A.    Classification is based on a physical characteristic
4  of the item; not whether it actually works or not.
5  Q.    So your testimony to this jury is, if it doesn't
6  even work, doesn't matter?
7  A.    That's correct.
8  Q.    What about —
9  A.    As long as it has design features and
10  characteristics of a firearm silencer, it will be
11  classified as a firearm silencer.
12  Q.    In your opinion, then, just because it looks like
13  this, regardless whether it works or not, in your
14  opinion, it is a firearm silencer?
15  A.    That's correct.
16  Q.    Regardless of what my client's intentions may or may
17  not have been, correct?
18  A.    That's correct.
19  Q.    All right.  You do understand that this is not a
20  strict liability statute.  My client had to intend to
21  make this.  You do understand that, correct?
22  A.    I don't know what your client did or did not intend
23  to do with these, sir.
24            MR. BETRAS:  All right.  Thank you.  Thank
25  you, Agent Swift.  You are excused.  Watch your step

1    going down.  Okay, folks.  We will take our afternoon

2    recess, about 10 or 15 minutes, refresh yourselves, keep

3    in mind the admonition.

4                (Jury out.)

5                THE COURT:  You guys can go through the

6    exhibits and if there are objections.

7                MR. TOEPFER:  And I will rest subject to the

8    admission.  I make a Rule 29 motion for acquittal.

9                THE COURT:  It is overruled.  Do you have

10   any —

11               MR. BETRAS:  I have a witness.

12               THE COURT:  And then that's it for you, too?

13               MR. BETRAS:  Yes, your Honor.

14               But I had my computer brought up from my

15   office, and so I've got to hook it up and make sure I

16   know how to work it, so I might need a few moments.

17               THE COURT:  That's okay.

18               MR. BETRAS:  Thank you.

19               (Recess had.)

20               (Jury in.)

21               THE COURT:  All right.  You may call your

22   first witness.

23               MR. BETRAS:  Thank you very much, your

24   Honor.

25               The Defendant calls Steve Howard to the

Mr. Howard - Direct

```
1    witness stand.
2                 THE COURT:  Mr. Howard, please raise your
3    right hand.
4                        STEVE HOWARD
5    called as a witness by and on behalf of the Defendant,
6    being first duly sworn, was examined and testified
7    as follows:
8                 THE COURT:  Tell us your name, and spell
9    your name for the record.
10                THE DEFENDANT:  Steven Charles Howard,
11   H-o-w-a-r-d.
12                THE COURT:  Thank you.  Go ahead.
13                     DIRECT EXAMINATION
14   BY MR. BETRAS
15   Q.   Mr. Howard, could you tell us about your education,
16   please?  Tell the jury about your education.
17   A.   I am a third generation gunsmith.  I have an
18   Associate Arts and Science Degree in Gunsmithing from the
19   oldest gunsmithing college in the country, Fernandez
20   State in Colorado, Southern Colorado specifically.  I
21   have a Bachelor of Science Degree in Criminal Justice
22   with training as an investigator.  I am a graduate of the
23   United States Law Enforcement Training Academy in Glynco,
24   Georgia.  I have a JD out of Cooley Law School in
25   Lansing, Michigan.
```

Mr. Howard — Direct

1    Q.    You are a lawyer, too?

2    A.    Yes.

3    Q.    The jury might not know what a JD means.  And could

4    you tell us about your employment history?

5    A.    All my life I worked as a gunsmith since 5 or 6.

6    Since I was 12, I was as good as my father.  By the time

7    I was 14, I was better than my father.  At 19, we stopped

8    working in the garage if you want to call it that and had

9    a store front, which we ran for six years.

10                From there, I went back to school, and my

11   father continued the trade.  I always worked the trade.

12   It is like practicing law, you never get out of it.

13   Starting about 1980, I did consulting, security based and

14   firearms based, and starting about 2002, I started

15   working as an expert witness.

16                I worked as an expert witness before, but

17   things never got past the refusal of a deposition, for

18   example.  And I work now about equal time, both as a

19   practicing attorney in the state of Michigan and as an

20   expert witness in firearms related matters.

21   Q.    Have you been qualified before to testify in federal

22   court about firearms?

23   A.    Yes, twice.

24   Q.    And have you been qualified in state court to

25   testify about firearms?

1   A.   Yes, in 14 states to include, I believe, Ohio.

2   Q.   Are you familiar with the Federal Firearms Act?

3   A.   Yes.  I haven't memorized the whole thing, but,

4   yes.

5   Q.   And have you taught anywhere?

6   A.   I have taught continuing legal education on the

7   subject of machine guns, silencers, illegal weapons,

8   bullet ricochet, gunshot residue, how to use firearms

9   experts, the list goes on.

10  Q.   Okay.  Was there a time I contacted you on this

11  case?

12  A.   Yes, there was.

13  Q.   And what did I request that you do?

14  A.   He asked me to look at specific items and tell you

15  whether they were silencers or muzzle brakes.

16  Q.   All right.  Let's backtrack a second.

17          Tell the jury what a muzzle brake is?

18  A.   A muzzle brake is an attachment you put on the end

19  of a firearm, and they can be put on rifles, shotguns,

20  and handguns that reduce two things:  One, the amount of

21  recoil coming back, the kick if you prefer the term, as

22  well as the bullet rise or jump, and there is probably

23  40 companies out there making muzzle brakes of one kind

24  or another that sell nationally that I am aware of.

25  Q.   And did I ask you to look at — well, did you

Mr. Howard — Direct

1   examine, not all of them, but the majority of the

2   exhibits that are here?

3   A.   Yes, I did.

4   Q.   Did you come to a conclusion about whether those, in

5   your opinion, are muzzle brakes or silencer parts?

6   A.   Yes, I did.

7   Q.   And based upon your education and your training do

8   you have an opinion based upon a reasonable degree of

9   scientific gunsmithing certainty as to whether or not the

10  parts that we are talking about here today are silencers

11  or whether or not they are muzzle brakes?

12  A.   They are muzzle brakes.

13  Q.   And what do you base that opinion on?

14  A.   The fact that I have been working on silencers

15  pretty much my whole life.  Silencers, like machine guns,

16  like cars, like so many other things, they are machines.

17  They clog up, they wear out.  They have to be repaired.

18  As the agent whose name I have already forgotten to my

19  ever loving shame.  I am terrible with names.

20              THE COURT:  Swift.

21  A.   (Continuing)  Stated you can get a license to

22  manufacture yourself a silencer.  I would assist people

23  in making these silencers, and it is perfectly legal.

24  The only problem is that the parts have to be in the same

25  room with the owner all the time.

Mr. Howard - Direct

```
1              MR. BETRAS:  Your Honor, if he could step
2    down and do an examination.
3              THE COURT:  Sure.
4    BY MR. BETRAS:
5    Q.   I am handing you what has been marked for
6    identification purposes as Government's Exhibit 1,
7    Government's Exhibit 2 and Government's Exhibit 35.  Do
8    you recognize each of these?
9    A.   Yes.
10   Q.   The Government's witness said the item in your right
11   hand is a muzzle brake, but the item in your left hand is
12   a silencer part.  Do you agree with that?
13   A.   I do not.
14   Q.   And why do you not agree with that?
15   A.   Because there is no way to attach a tube on this,
16   and this is a beautifully designed state of the art
17   muzzle brake that I have never seen the likes of before.
18   It is phenomenal.
19              Now, what makes it so much different than
20   this one is, it has got a great big hole that you can
21   literally see through.  So as the good agent testified,
22   in about 3 inches ineffective gas is blown off, but what
23   makes this one so much different is the holes are very
24   small, and the diameter is very — you can see the
25   difference in the diameters on the ends.  Anyone with
```

Mr. Howard — Direct

1    halfway normal eyesight can see.

2                  Can I get closer?

3                  THE COURT:  Sure.

4                  THE WITNESS:  Thank you.

5                  With the Court's permission, you can

6    see these holes are so much different.  Now, this is

7    very, very crucial in making a muzzle brake more

8    effective.

9    BY MR. BETRAS:

10   Q.   You can have a seat back there.

11   A.   Well, I still need to respond explain how it works.

12   Q.   Thank you.

13   A.   Now, with this, once the bullet gets to about here

14   the gas can jump around it wherever it wants, and by the

15   time it gets to about this much distance, it is stopped

16   being forced out to the sides, and a lot of it just blows

17   wherever it wants.

18                  But now, with this small diameter and all of

19   these flutes — and you can see all of these flutes

20   points toward the rear — so the gas comes out of the

21   first hole, strikes this flange and is forced back into

22   the rear.

23                  And because of the small diameter — in

24   fact, we have a large volume of gas, and I mean a lot.

25   223/5.56 natone —

Mr. Howard – Direct

1  Q.   What is that?

2  A.   That's the M-16 model.  223/5.56 millimeter natone

3  also known as the AR 15 and M-16 model, uses 28 grains of

4  gun powder, which is quite a bit.  I use that caliber to

5  kill deer in many states.

6           Now, as the gas is pushing out here, the

7  small diameter of the exit holes here can't bleed out all

8  that gas at once, and it is designed this way because

9  then the bullet continues forward, and it goes past this

10  second hole, and it repeats the process.

11           It hits this one and forces it to the rear

12  as well and the next one and the next one and the next

13  one, all the way up to here.  In fact, if you have a long

14  enough one clear up to here because that much gas creates

15  a balloon of gas about this big?

16           And when you have got these tiny little

17  holes, it will all not be blown out in 3 inches.  It is

18  just not going to happen.  But because it progressively

19  bleeds the gas and Newton's law, for every action there

20  is a reaction, it comes out and strikes these flanges,

21  thrown back into the rear, that pushes the muzzle brake

22  forward, which, with it, pushes the firearm forward, and

23  when it does that, it kills the recoil, and with the test

24  that I conducted, you are going to see how it kills 50

25  percent of the recoil.

Mr. Howard — Direct

1   Q.   All right.  Have a seat.  Did you do a test fire in
2   this case?
3   A.   I did, sir.
4   Q.   And have you done test fires before in cases?
5   A.   Yes, I have.
6   Q.   And what was the purpose of you doing a test fire in
7   this case?
8   A.   To determine, to prove or disprove a theory, and in
9   this case, standard scientific operational procedure is
10  to develop a theory and then attempt to prove or disprove
11  it.
12  Q.   Did you video your test fire?
13  A.   Yes, I did, and so did others.
14          MR. BETRAS:  Can we play this?  Your Honor,
15  will this show up on the screen.
16          THE COURT:  If I put it on the computer it
17  will.
18  BY MR. BETRAS:
19  Q.   If you can narrate what's happening.
20          (Video played.)
21  A.   Now, the firearm is suspended by two ropes to where
22  it is held by gravity, and there is a dowel affixed to
23  the back of the butt plate and a ruler yardstick laying
24  on the ground.  This shows us how far it is thrown back.
25  Now, I am using a cable that measures how far it is

Mr. Howard — Direct

1    kicked to the rear.

2    Q.   Okay.  And that's without the brake on it, correct?

3    A.   Well, we tried a couple of different brakes, and

4    then we tried the item in question.

5              Now, with no brake, it kicked it back 21

6    inches.  So basically, the recoil, just the recoil threw

7    it backwards 21 inches.

8              We then tried it with the factory equipped

9    flash hider and threw it back 21 inches.

10             MR. BETRAS:  Can we play that?

11             (Video played.)

12   BY MR. BETRAS:

13   Q.   Okay.  So did you affix a muzzle brake similar to

14   the one that we were talking about here?

15   A.   I affixed one similar to that at one point, and it

16   barely made a difference.  I mean — may I refer to my

17   notes?

18   Q.   Yes.

19   A.   There was no appreciable change.

20   Q.   So that muzzle brake, at least one similar to that,

21   didn't do what it was intended to do?

22   A.   It did pretty much nothing.

23   Q.   And when you took this piece and put it on, tell the

24   jury what happened.

25   A.   Instead of being kicked back 21 inches, it was

1  kicked back 11, which is almost right at a 50 percent

2  reduction in recoil.

3  Q.   Have you ever seen a muzzle brake give you a

4  50 percent recoil?

5  A.   Recoil reduction?  Do I understand the question

6  correctly?

7  Q.   Yes.

8  A.   No, I have not.

9  Q.   In all your years?

10  A.   And I am a speed shooting competitor.  I am a former

11  Michigan three gun champion, which is speed shooting with

12  semiautomatic rifles.  And this muzzle brake is so

13  fantastic that I would put them on all my guns if I

14  could.  That allows me to shoot 50 percent faster, and

15  this advantage alone would allow me to just blow away my

16  competitors, all of them.

17  Q.   And other gun enthusiasts would recognize the value

18  of this muzzle brake?

19  A.    Instantly.  If I were to take a big bag of the

20  finished products to a three-gun shoot, I could probably

21  sell one to almost every single competitor on the spot.

22  Q.   Have you ever seen anything of this size before you

23  have seen these?

24  A.   No, I have not.  And I am convinced its length is a

25  big part of what makes it so effective.

Mr. Howard — Direct

1    Q.   Now, you heard the special agent testify that you

2    could put a tubing on this; that it is a part of a

3    silencer.  You heard that testimony.

4    A.   I did.

5    Q.   You were in here when he did that.  And he said

6    whether it works or not is immaterial.  Do you agree with

7    that assessment?

8    A.   No, I don't.

9    Q.   Why?

10   A.   That's basically guilt by association then.  I mean,

11   somebody takes a Ford truck and runs over a bunch of

12   people, you going to prosecute the guy who put the truck

13   together?

14              But physically, in terms of doing it, the

15   M-16 round, the AR 15 round operates at 56,000 psi.

16   There is no way to attach a tubing on the outside of

17   these muzzle brakes.

18   Q.   Why do you say that?

19   A.   Well, one, there is no place to thread it in.

20   Q.   Now, when you say thread it in, are you referring to

21   Government's Exhibit 33 and Government's Exhibit 34?

22   What's the significance of these?

23   A.   Well —

24              MR. BETRAS:  Can he go down and show the

25   jury, your Honor?

Mr. Howard - Direct

```
 1              THE COURT:  Sure.
 2              THE WITNESS:  This is probably easiest to
 3    understand.
 4              If I may, may I approach the jury?  This is
 5    rather small.
 6              THE COURT:  Sure.
 7    A.   Now, this to be especially made to go on this, and
 8    it is a very precise piece of machine and threads on.  It
 9    is very, very solid.  And at the back towards where it
10    screws into the rifle, there are threads right here that
11    allows you to do this.  I will try and walk down so
12    everybody can see this.
13              There are threads where my finger is, and it
14    is bigger around where the threads are than the rest of
15    the tube.  But yet, on the item in question, it is all
16    the same size, the whole length.  So how do you put a
17    thread on it?  The simple answer is you don't.
18              Now, duct tape and conduit and PVC pipe when
19    it is this small cannot contain 65,000 pounds.  It just
20    can't happen.  Now, if you made one this long and about
21    that big around, sure, it would contain it, but something
22    this small, it would blow it to pieces.
23              Now, what else is interesting is these types
24    of silencers, notice how they don't have little small
25    holes that forces the gas to continue going down the tube
```

Mr. Howard — Direct

1    the way this one does.

2              A third major difference is this is either

3    steel or titanium, and not only is it steel, it is very

4    special steel.  It is rich with nickel, not the

5    nickel-silver that we have in our pockets but nickel, and

6    that makes it stand the heat.

7              Now, this doesn't have to stand a lot of

8    heat, and it doesn't have to stand a lot of pressure

9    because it is venting that pressure and giving off that

10   heat because it is not designed to be contained in a

11   tube.

12             It is meant to throw off the gas and,

13   therefore, throw off the heat.  This has to contain it.

14   That's why it is made out of special alloy.  If this was

15   made out of steel, the Government might be right, but

16   it is not.  It is made out of your run-of-the-mill

17   aluminum.

18   Q.   How hard is it to weld aluminum to aluminum?

19   A.   You have to have special equipment, and it is

20   difficult because the aluminum warps.  Ask any welder.

21   It warps badly.  So unless things are precisely machined

22   and this isn't, it doesn't need to be on the outside,

23   just needs to be on the inside, it is not going to stand

24   up.

25             It is literally when it is forcing into one,

1    it is going to cave in to the other, and on the front

2    end, it will blow the flanges off because the way this

3    thing is designed.  The reason it doesn't is, again,

4    because it is able to vent that gas out the sides, and

5    the pressure doesn't build up.  It redirects it.  This

6    captures it.  That's the big difference.  That's the

7    difference between a muzzle brake and a silencer.

8    Q.   So you disagree with the Government's expert witness

9    that you could simply put a tube over this, and somehow

10   that's going to make it work?

11   A.   I disagree completely, yes.

12   Q.   And you disagree with the Government's — have a

13   seat up there — assertion about longer than three

14   inches?

15   A.   Yes, I disagree with the Government's assessment

16   that length makes it a silencer.  Length makes it more

17   efficient for what it was designed to do.  On normal

18   designs of silencers, they are right; that where there is

19   a big escape around the bullet and things are not

20   precisely machined, they are right, and I played around

21   with some of these years ago, and yeah, after about

22   three, three and-a-half inches, depending on a number of

23   variables, maybe four, it becomes counterproductive?

24             But when you shrink the bore holes down that

25   surround the bullet and where the gas escapes, that —

Mr. Howard — Direct

1    those rules are shattered.  This is the probably the most

2    revolutionary muzzle brake I have ever seen.  It blows my

3    mind.

4    Q.    I assume your opinion is, this is not a

5    silencer part because it cannot be readily made into

6    a silencer?

7    A.    No.  If somebody really wants to work hard enough,

8    you can make a silencer out of pretty much anything.

9    Again, you can use a potato.  You can use a towel.  You

10   can get a piece of tube and weld it to a regular flash

11   hider, dump a bunch of flash hiders down the tube and

12   weld a cap over the top with a hole in the middle, and it

13   is a silencer.  So I mean, everything can be made a

14   silencer if you tried hard enough.

15   Q.    The Government's contention is that this is made

16   specifically designed so you can put a tube over it.  You

17   heard that testimony?

18   A.    I heard that testimony, yes.

19   Q.    Are you a machinist?

20   A.    Yes, I am and a welder.

21   Q.    And a —

22   A.    And a welder.

23   Q.    And a welder.  Are these muzzle brakes precisely

24   machined?

25   A.    No.

1   Q.   What's the significance of these muzzle brakes not

2   being precisely machined?

3   A.   If the outside tube does not fit precisely,

4   especially on a metal that can give like aluminum —

5   let's say there is a gap and the pressure hits one

6   chamber, it can sit and go look this and break.  It has

7   to be up against it to stop it from moving that way,

8   especially when you are talking 65,000 pounds per square

9   inch.

10  Q.   I am going to ask you a hypothetical question.

11            Hypothetically speaking, if you were to put

12  a tube over one of these muzzle brakes and then ratchet

13  it down with a screw, do you have an opinion as to what

14  would happen when you fired that.

15  A.   I am not sure, ratchet it down with a screw.  You

16  mean put a cross screw in it, for example?

17  Q.   Yeah.

18  A.   Well, since they are so imprecisely machined, first

19  of all, you would have to — you'd have two choices.

20  Either, one, you would either have to machine the inside

21  of the tube to fit the individual muzzle brake, in which

22  case if you have got machine tool equipment that is that

23  good and you have that much skill, you don't need to buy

24  that product to make a silencer, or there is going to be

25  a big gap right around here between the internal and the

Mr. Howard - Direct

1    outer pipe.

2              And when you pull the trigger with that much

3    pressure, it is going to blow right back — a certain

4    portion of that gas and burning gun powder is going to

5    blow right back in your face.  So —

6    Q.    It would be very dangerous is what you are saying?

7    A.    Yes, especially to your eyesight.

8    Q.    I think we talked about progressive gas bleed.  Do

9    you recognize a called concept progressive gas bleed?

10   A.    Yes.

11   Q.    What is progressive gas bleed?

12   A.    That's what I discussed where on each set of flanges

13   it bleeds only a little bit, and it progressively bleeds

14   more and more because as number 2, number 3, number 4,

15   and number 5 holes are bleeding it, number one is still

16   bleeding it and still pushing, so it progressively bleeds

17   the gas the whole length of the muzzle brake and thereby

18   allows a longer muzzle brake to be more effective.

19              MR. BETRAS:  Thank you.  One second, your

20   Honor.

21              (Pause.)

22              MR. BETRAS:  I will pass the witness, your

23   Honor.

24              THE COURT:  Thank you.

25              Ms. Henderson?

Mr. Howard - Cross

1    CROSS EXAMINATION
2    BY MS. HENDERSON
3    Q.   Mr. Howard, you talked briefly on direct about your
4    education, correct?
5    A.   Yes.
6    Q.   And you talked about your Bachelor's Degree you
7    received in criminal justice?
8    A.   Yes, ma'am.
9    Q.   And is it true you started Pikes Community College
10   in 1983 studying criminal justice?
11   A.   I only took specific courses that I thought would be
12   useful in becoming a law enforcement agent.
13   Q.   Directing you back to my question, you were
14   studying criminal justice, police science, and police
15   firearms?
16   A.   Yes, as well as fingerprints and police photography,
17   and I forget what else.
18   Q.   And then you attended Southern Colorado in 1985, and
19   you studied criminal justice?
20   A.   Yeah.  For a short period, yes.
21   Q.   And both of those short periods, you did not obtain
22   a degree, correct?
23   A.   I was not after one at the time.
24   Q.   And then, you attended Metropolitan State College of
25   Denver, again studying criminal justice?

Mr. Howard - Cross

1    A.    Yes.

2    Q.    And then you obtained a degree in December of

3    1989?

4    A.    Yes, ma'am.

5    Q.    After that, you went to go work at your father's gun

6    repair shop?  You talked about that.

7    A.    I kind of never stopped.

8    Q.    But at this point, as you testified on direct, this

9    is the point where you guys, I guess as you said, took it

10   out of the garage, and you opened up a shop?

11   A.    Yes, which we closed down in '86.

12   Q.    Okay.  And when you guys opened the shop, your

13   father had a firearms repair license, correct?

14   A.    Sales and repair and ammunition sales license, yes,

15   a Class 1.

16   Q.    And he obtained that license from ATF?

17   A.    We took it over from a man named Bob Humphries,

18   transferred the shop, and yes, the license was issued

19   from ATF, yes.

20   Q.    And that license was required to run the shop?

21   A.    To simply repair firearms, no.  But to sell

22   firearms, yes.

23   Q.    To sell firearms you needed that license?

24   A.    I can't hear you.

25   Q.    To sell firearms at that shop, you needed a

Mr. Howard - Cross

1   license?

2   A.   Yes, ma'am, and to sell ammunition as well.

3   Q.   And after your employment there and everything, you

4   decided to go to law school at some point?

5   A.   Yes.

6   Q.   I'm sorry.  Before we get to law school, after that,

7   working for your father, you were unemployed from 1989 to

8   1992.  Is that correct?

9   A.   No.  I just didn't list the relevant things that I

10  was working.

11  Q.   So your —

12  A.   I was a security guard at hospitals, and I worked

13  security guard at supermarkets, basically put myself

14  through school.  They were not really relevant to what I

15  do, so I left them off the CV.

16  Q.   And then, in 1992, you started at U.S. Border Patrol

17  as a field agent?

18  A.   Yes.

19  Q.   And this is when you referred to on direct you went

20  to law enforcement training?

21  A.   Yes.

22  Q.   And you worked there for nine months?

23  A.   Yes, ma'am.

24  Q.   And you left because you didn't like Border

25  Patrol?

Mr. Howard - Cross

1    A.    No.  I couldn't learn Spanish fast enough.

2    Q.    And you decided you would prefer to go to ATF?

3    A.    No.

4    Q.    You wanted to be an ATF agent?

5    A.    I think I applied at one time, but I couldn't score

6    highly enough on the test to get in.

7    Q.    You couldn't score highly enough on the test to get

8    into ATF?

9    A.    There was an entrance test and —

10   Q.    And you couldn't pass it?

11   A.    I couldn't pass it.

12   Q.    And do you remember your father sending a letter to

13   ATF asking if it would be possible for you to transfer

14   to there while you were in training for Border Patrol?

15   A.    I don't recall.

16   Q.    So that was unsuccessful.  You still didn't get into

17   ATF?

18   A.    No.  I didn't get into ATF.

19   Q.    After you left Border Patrol, you went to work as an

20   office manager at Parkside Center?

21   A.    No.  I worked for — I worked on and off for them on

22   a couple of occasions but I went to work for Department

23   of Defense, Federal police.

24   Q.    Before that, though, you were at Parkside Center,

25   correct?

Mr. Howard - Cross

1    A.    Yes.

2    Q.    And you were there for only six months?

3    A.    I don't remember the exact time.

4    Q.    It was a short period of time?

5    A.    Yes.

6    Q.    And after that, as you stated, you went to go work

7    for the Department of Defense, Federal Police, as a

8    federal police officer?

9    A.    Yes, ma'am.

10   Q.    And again, you were only there for six months?

11   A.    Yes, ma'am.  I got hurt on the job.

12   Q.    So your two positions working in law enforcement

13   total 15 months?

14   A.    Yes, ma'am.

15   Q.    Okay.

16   A.    Long enough to get the training.

17   Q.    And after that, you went to go work at C Sharps

18   Arms?

19   A.    Yes, a firearms manufacturer.

20   Q.    And you worked there for a little over a

21   year-and-a-half?

22   A.    Yes.

23   Q.    Okay.

24   A.    While I prepped for the law school entrance test.

25   Q.    Directing you back to my question, you worked there

Mr. Howard - Cross

1    for a little over a year and a half?

2    A.    That is correct, Ma'am.

3    Q.    And then you went to law school?

4    A.    Yes, ma'am.

5    Q.    And you went to law school at Thomas Cooley School

6    of Law in Michigan?

7    A.    Yes, ma'am.

8    Q.    And there you focused on wills, trusts, and

9    estates?

10   A.    No.   That's what I got the book award in.  It is a

11   required class, but that was not my concentration.

12   Q.    Not only getting the book award, didn't you work as

13   a research assistant and do a lot of other things in that

14   area?

15   A.    I did research for a number of instructors, for a

16   number of different things.

17   Q.    One of them was wills, trusts, and estates?

18   A.    Yes.

19   Q.    And that's the one on your curriculum vitae?

20   A.    Yes.

21   Q.    You didn't focus on firearms laws while you were in

22   law school?

23   A.    No.

24   Q.    After that, you continued to work — after law

25   school, you continued to work as a paralegal for a little

Mr. Howard - Cross

1   while?

2   A.   A short period at the law firm where I had done my

3   required externship, yes.

4   Q.   And then you started your own firm?

5   A.   Yes.

6   Q.   And ever since then, you have been self-employed as

7   a lawyer, and you've also been consulting?

8   A.   And testifying, yes, Ma'am.

9   Q.   Which is a part of your consulting business,

10   correct?

11   A.   Correct.

12   Q.   And as a lawyer, you advise clients on the law?

13   A.   Yes.

14   Q.   You work in a variety of areas, family law, contract

15   law, real estate law, immigration, those are all areas

16   you work in?

17   A.   Yes, ma'am.

18   Q.   And you can't know everything about the law

19   concerning those topics, correct?

20   A.   Correct.

21   Q.   So when clients come to you for advice about whether

22   or not something is illegal, you have to research the

23   law?

24   A.   Sometimes, yes.

25   Q.   If you didn't research the law, it would be

Mr. Howard - Cross

1    considered malpractice?

2    A.    If I already know what the law is.

3    Q.    So if you didn't know the law and didn't research

4    it, it would be malpractice?

5    A.    That's assuming I didn't already know it, yes, and I

6    would research it if I had not already researched it.

7    Q.    And you would agree with me that sometimes the law

8    isn't on your side?

9    A.    That's a very vague question, Ma'am.  I would need

10   a more specific question in order to answer it

11   truthfully.

12   Q.    Sometimes there could be an unfavorable case law

13   precedent in the area?

14   A.    In regard to what?  I am afraid you have confused

15   me.

16   Q.    Sometimes your clients may have an issue, and you

17   may go to research the law, and the law might not turn

18   out with the result that they want.  Isn't that

19   correct?

20   A.    Yes, that's possible.

21   Q.    You still have an obligation to advise your client

22   on what the law is.  Isn't that correct?

23   A.    If they want my advice, yes.

24   Q.    So you advise them what the law is rather than what

25   they want the law to be, correct?

Mr. Howard - Cross

1    A.    Correct.

2    Q.    Additionally, as a lawyer, you have to follow

3    certain rules?

4    A.    Yes.

5    Q.    And an example of rules, each court may have

6    different rules.  Isn't that correct?

7    A.    They all fall within certain parameters, but yes,

8    some have procedural rules that vary from others, that's

9    correct.

10   Q.    And if you go to another court you are not

11   familiar with, you have an obligation to follow their

12   rules?

13   A.    True.

14   Q.    This may require looking up the rules before you

15   go?

16   A.    Not necessarily.

17   Q.    Or when you get there, you look up the rules?

18   A.    Or ask.

19   Q.    So at some point, you either look or you ask for the

20   rules, correct?

21   A.    If I know there is a possible problem.  For example,

22   I don't need to ask for the specific rules to simply file

23   an appearance.

24   Q.    Now, let's talk about your training.

25              You have never received manufacturing

Mr. Howard — Cross

1    and historical instruction at a firearm factory, have
2    you?
3    A.    Can you repeat the question?
4    Q.    You never received manufacturing or historical
5    instruction at a firearm manufacturing factory, have
6    you?
7    A.    Yes, I have.
8    Q.    You have toured a manufacturing firearm factory?
9    A.    I worked at one.
10   Q.    Directing you back to my question, you haven't
11   received training at one in this area since you have been
12   consulting?
13   A.    You didn't say about silencers, or did you?
14   Q.    No.
15   A.    I don't remember you saying that.
16   Q.    I am talking about firearm factories.  Have you
17   received training on manufacturing and historical
18   instruction at a firearm factory?
19   A.    Yes, C Sharps Arms.
20   Q.    And when was that?
21   A.    It is on my resume.  That was 1994 through almost
22   1996, I think.
23   Q.    And that's the only manufacturing company you have
24   ever received instruction at?
25   A.    Specifically.  We received a great deal of

1   manufacturing principle and historical training to

2   include silencers and machine guns at Trinidad State

3   Junior College in my gunsmithing career, my gunsmithing

4   education.

5   Q.    That was not a manufacturing facility.

6   A.    No.  How much can you learn in one day of walking

7   through the plant?

8   Q.    You only walked through one plant, correct?

9   A.    But I studied the manufacturing techniques of

10  probably 30.

11  Q.    Directing you back to my question, you've walked

12  through one plant?

13  A.    No, two.

14  Q.    You don't list any of these other plants in your

15  curriculum vitae?

16  A.    I didn't consider it important enough.  I walked

17  through the place.  So what?  It didn't seem important

18  enough to put on the CV.

19  Q.    And when you walked through the plant, you didn't

20  receive training?

21  A.    No.  I was just given a tour.  It just didn't seem

22  important.

23  Q.    So it was not training?

24  A.    Depends on your definition of training, but they sat

25  and explained the principles of how they make their

Mr. Howard - Cross

1    product and how things are done, and yeah, that's fine, I

2    knew that.  Thank you for telling me.

3    Q.   And so you don't think learning how firearm products

4    are manufactured and how they are done is significant to

5    this case?

6    A.   I already know how firearms are manufactured and how

7    silencers are manufactured.

8    Q.   Now, moving on, you've also never attended a

9    training specifically focused on the manufacture, design,

10   or operation of firearm silencers?

11   A.   We covered it specifically in my college education

12   at Trinidad, yes.

13   Q.   Never from a firearm manufacturer?

14   A.   I'm sorry?

15   Q.   Never from a firearm manufacturer?

16   A.   No.

17   Q.   You also never received training on the Gun Control

18   Act of 1968?

19   A.   I have read it.  I haven't memorized it, but I have

20   read it.

21   Q.   You haven't received training on it?

22   A.   I think we covered it in one of the criminal classes

23   that I took in law school, but I couldn't tell you which

24   one.

25   Q.   Directing you back to my question, you never

Mr. Howard - Cross

1    received training on that?

2                    MR. BETRAS:  Objection, your Honor.

3                    THE COURT:  Overruled.

4    A.    Yes, I have.  Not a ton, but yes, I have.

5    Q.    You have never received training on the National

6    Firearms Act of 1934?

7    A.    Yes, I have in Trinidad specifically.

8    Q.    Now, going back — going to instruction,

9    you've never taught at the ATF special agent basic

10   training?

11   A.    No.

12   Q.    You have never taught at the NFA Firearms

13   Identification Course on foreign law enforcement?

14   A.    No.

15   Q.    You never taught a firearms identification

16   course?

17   A.    Yes, I have.

18   Q.    Are you familiar with ATF?  You are familiar with

19   ATF?

20   A.    Yes.

21   Q.    You know that they regulate firearms?

22   A.    Yes.

23   Q.    Are you familiar with the ATF Handbook?

24   A.    No.

25   Q.    So you are not familiar with the book that talks

Mr. Howard - Cross

1    about whether or not firearms are regulated?

2    A.    I called ATF and tried to get a copy of the book,

3    and they said it is all online, read it online.

4    Q.    And you never went online?

5    A.    You didn't ask me that.  I have been reading it

6    online.

7    Q.    So you are familiar with it?

8    A.    Define "familiar."  Have I read the whole thing?

9    No.  I read parts, yes.

10   Q.    You read parts, and you know what it is?

11   A.    Yes.

12              MS. HENDERSON:  May I approach the witness,

13   your Honor?

14              THE COURT:  You may.

15   BY MS. HENDERSON

16   Q.    I am handing you a copy of the ATF Firearms

17   Handbook.

18              Now, you would agree with me that ATF

19   provides license for those who desire to manufacture and

20   deal in firearms.

21   A.    For those operating in the United States, yes.

22   Q.    Such as your father, correct?

23   A.    Yes.

24   Q.    And a person that desires to make a National

25   Firearms Act firearm that does not have a license must

Mr. Howard - Cross

1   submit a form.  You would agree with that?

2   A.   If they are making a firearm, yes, but not if they

3   are — not if they are making a muzzle brake.

4   Q.   But if they are making a firearm, you agree they

5   need to submit a form?

6   A.   I'm sorry?

7   Q.   If they are making a firearm, you agree they need to

8   submit a form?

9   A.   If they are making a firearm, yes.  Muzzle brakes

10  are not firearms.

11  Q.   Now, I would like to direct your attention to

12  Section 7.2.4 in there.  I believe I have it tabbed in

13  there for you?

14  A.   Green or —

15  Q.   Pink.

16  A.   Pink.  Okay.  What about it?

17  Q.   Could you please read that provision to the

18  jury?

19  A.   Which one?

20  Q.   7.2.4.

21          MR. BETRAS:  Objection your Honor.

22          THE COURT:  Overruled.

23  Q.   7.2.4?

24  A.   "Do you know how ATF would classify your product?

25  There is no requirement in the law or regulations for

1    manufacturer to seek ATF classification for his product

2    prior to manufacture."

3    Q.    Could you continue, please?

4    A.    I'm sorry.

5    Q.    Could you please continue?

6    A.    "Unless a firearm manufacturer is well advertised"

7    —

8    Q.    Could you go back and start at "nevertheless"?

9    A.    "Nevertheless firearm manufacturers well advised to

10   seek ATF classification before going to the trouble and

11   expense of producing it."

12   Q.    You can continue.

13   A.    Says "advised" not "required."

14   Q.    Could you please go ahead and read it?

15   A.    "Perhaps the manufacturer intends to produce a GCA

16   firearm but not an NFA firearm.  Submitting a prototype

17   to ATF — ATF's Firearms Technology Branch for

18   classification in advance of manufacture is a good

19   business practice to avoid an unintended classification

20   or violation of law."

21   Q.    Could you now go down to Section 7.2.4(1) right

22   under that, I believe?

23   A.    "ATF classification letters.  ATF letter ruling

24   classifying firearms may generally be relied upon by the

25   recipients as the agency's official position concerning

1    the status of firearm under the federal firearms law.

2    Nevertheless, classifications are subject to change if

3    later determined to be erroneous or impacted by

4    subsequent changes in the law or regulations.  To make

5    sure their classifications are current, FFLs/SOTs should

6    stay informed by periodically checking the information

7    published on ATF's website, particularly amendments to

8    the laws or regulations, published ATF rulings and open

9    letters to industry members."

10   Q.    So you would agree with me that the ATF handbook

11   recommends that if someone wants to make a firearm, that

12   they should contact the ATF Firearms Technology Branch

13   for clarification.

14              MR. BETRAS:  Objection.

15              THE COURT:  Overruled.

16   A.    Only if they are making a firearm.  He is not making

17   a firearm.

18   Q.    You would agree it says if you are thinking about

19   making a firearm.

20   A.    If you are making a firearm, and that's not the

21   case.  This is apples and oranges.

22   Q.    Are you familiar with the definition of "firearm"

23   under the Gun Control Act?

24   A.    No, I am not.

25   Q.    You are not familiar with the definition under the

Mr. Howard - Cross

1   Gun Control Act?

2   A.   Not off the top of my head.

3   Q.   And you are not familiar with the definition of

4   firearm silencer under at any Gun Control Act?

5   A.   A firearm silencer I am.

6   Q.   So you do know the definition of a firearm includes

7   firearm silencer?

8   A.   Yes.

9   Q.   So you are familiar enough to know that this term

10  "firearm" also includes "silencer"?

11  A.   Yes.

12  Q.   So if a person wants to make a silencer, you would

13  agree that the ATF handbook recommends that they contact

14  the ATF Firearms Technology Branch first for

15  clarification?

16          MR. BETRAS:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A.   Only if they want to make a silencer.  He didn't

19  want to make a silencer; he wanted to make a muzzle

20  brake.  He is not required to do anything.

21  Q.   And you would agree with me if a person had done

22  that and got a classification letter, then they would be

23  able to rely on that letter?

24  A.   Unless ATF changes its mind again.

25  Q.   Well, if you — go back to what you just read.  You

Mr. Howard - Cross

1    agree it says that if you obtain a letter, then you can
2    rely on that letter?
3    A.   But only if you are trying to make a firearm.  He
4    was not making a firearm.
5    Q.   Now, going back to those definitions, you said
6    you are familiar with the definition of firearm
7    silencer?
8    A.   Yes.
9    Q.   Can you tell us what it is?
10   A.   A firearm that is attached — and I am paraphrasing
11   here — that tends to silence or muffle a shot.
12   Q.   You are leaving out a lot of that definition,
13   correct?
14   A.   Yes, but that's the high points.
15   Q.   The high points?
16   A.   Only this doesn't muffle it.  It makes it
17   louder.
18   Q.   You would agree with me that that definition —
19   oh, if you would turn to that second tab there, here
20   the definition of firearm silencer so we don't have to
21   guess.
22   A.   "Any device for silencing, muffling, or diminishing
23   a report of a portable firearm including any combination
24   of parts designed or — designed or redesigned and
25   intended for use in assembling or fabricating a firearm

1   silencer or firearms muffler and any part intended for

2   use in such assembly or fabrication."

3   Q.   So you would agree with me that a part of a firearm

4   silencer is considered a firearm silencer?

5   A.   If somebody intentionally makes it as a firearm

6   silencer part, yes.  He didn't do that; he made a muzzle

7   brake.

8   Q.   Okay.

9   A.   That's not a silencer part.

10  Q.   Directing you back to my question, you agree that a

11  firearm silencer part would also be classified as a

12  firearm silencer.

13  A.   And again, I say yes, only if you intentionally make

14  a firearm silencer part, which he did not do.

15  Q.   Now, Mr. See's attorney retained you to testify as

16  an expert in this case?

17  A.   Yes.

18  Q.   Mr. See did not retain you when he began

19  manufacturing the parts in question, did he?

20  A.   No, he did not.

21  Q.   Mr. See did not ask you for advice on whether or not

22  these parts were legal before he made them?

23            MR. BETRAS:  Objection, your Honor.

24            THE COURT:  Objection sustained.

25

Mr. Howard - Cross

1    BY MS. HENDERSON:

2    Q.   Mr. See did not retain you when he began selling

3    these items on eBay?

4              MR. BETRAS:  Objection, your Honor.

5              THE COURT:  He already answered that

6    question.

7    BY MS. HENDERSON:

8    Q.   Mr. See did not retain you on January 20, 2016, when

9    the ATF agents came to his house to check, to see if he

10   was making silencers?

11             MR. BETRAS:  Objection, your Honor.

12             THE COURT:  Objection sustained.

13   BY MS. HENDERSON

14   Q.   The first time you were retained in this case was on

15   August 31, 2016, after Mr. See was indicted?

16   A.   I don't remember the exact date.  It is in my

17   report.

18   Q.   It was after Mr. See was indicted in this case?

19   A.   That is my understanding, yes.

20   Q.   Now, let's talk about your analysis in this case.

21   You contend that most muzzle brakes are about two inches

22   long?

23   A.   I stay with — I stay with ATF's definition of

24   between 2 and 3 inches, most of them, yes.

25   Q.   And, in fact, you testified on direct examination

Mr. Howard - Cross

1    that you have never seen a muzzle brake of this size?

2    A.    That is correct.  I have also never seen one that

3    worked as well, either.

4    Q.    You agree with me that most of the parts

5    manufactured by Mr. See were 6 to 8 inches?

6    A.    I couldn't hear you, Ma'am.

7    Q.    You agree that most of the parts manufactured by

8    Mr. See were 6 to 8 inches?

9    A.    I don't remember off the top of my head.

10   Q.    But you agree they are significantly longer than

11   what a muzzle brake should be?

12   A.    Well, not should be.  I think they should be any

13   length they serve a purpose and work, but it is ATF that

14   decides they should be no longer than three inches.  But

15   I don't hold with that opinion at all, especially in

16   light of this case.

17   Q.    And let's talk about the testing you did in this

18   case.

19              Now, you testified on direct that as part of

20   your testing you looked at factory muzzle brakes?

21   A.    Yes.

22   Q.    And you stated that first you tested it with the

23   factory muzzle brake on, correct?

24   A.    I don't remember the specific order.  I don't have

25   my report in front of me, but I tested it both with the

1  muzzle brake simply rubberbanded to the outside of the

2  barrel so the firearm would weigh the same.

3  If you make it lighter, it is going to

4  recoil more, simple physics there, and then either before

5  or after, then I, again, tried its proper position, and

6  it was done that way with all of the muzzle brakes that I

7  tested, including the one in question.

8  Q.   Okay.  So at some point, you tested it with what

9  you called a flash hider muzzle brake with it on,

10  correct?

11 A.   Yes.

12 Q.   And when you did that, the recoil was 21 inches?

13 A.   Yes.

14 Q.   And then you took that flash hider muzzle brake off

15 and tested it again?

16 A.   Yes.

17 Q.   And the recoil was still 21 inches?

18 A.   Yes.

19 Q.   So you agree with me that's ineffective as a muzzle

20 brake?

21 A.   Yes.

22 Q.   And as you testified on direct, that was a flash

23 hider?

24 A.   I have tried flash hiders and muzzle brakes both.

25 Q.   Directing you back to your report, the one you

Mr. Howard - Cross

1    talked about in your report and wrote about in your

2    report you would agree with me that that was a flash

3    hider, correct?

4    A.    There can be those that perform both purposes.  They

5    are not exclusively one or the other.

6    Q.    However, this didn't perform both purposes, correct?

7    A.    In my opinion, it didn't perform either purposes.

8    The old joke goes, what are fishing lures designed to

9    cash?  Fishermen.  They are designed to make the

10   manufacturer money.  Whether they work or not is

11   irrelevant.

12   Q.    So you would agree with me that this was an

13   ineffective muzzle brake?

14   A.    Yes.

15   Q.    And then, you compared the items that were obtained

16   from the Defendant to an ineffective muzzle brake?

17   A.    Yes.

18   Q.    And based on that comparison, you decided that these

19   items were a muzzle brake?

20   A.    Yes.

21   Q.    Now, also going to your report, in your report,

22   you said that you relied on Newton's theory of law,

23   correct?

24   A.    Yes.  I believe so, yes.

25   Q.    Where did you look up Newton's law?

Mr. Howard - Cross

1   A.    I don't remember.  A long time ago in an

2   Encyclopedia Britannica.

3   Q.    You don't cite to any other law in your report,

4   correct?

5   A.    That's the simplest most basic scientific law I can

6   cite and certainly the most relevant.

7   Q.    So you don't cite to any other law?

8   A.    I don't need to.  The simplest science is always the

9   best.

10  Q.    And you don't cite to any peer-reviewed articles?

11  A.    What's more peer-reviewed than Newton?

12  Q.    You don't site to any ATF testing?

13  A.    No.

14  Q.    You don't cite to any other expert testing?

15  A.    Nobody has ever tested this.  It is brand new.

16  Q.    So you don't cite to any other testing or any other

17  law besides Newton's third principle?

18  A.    That's all I needed.  Why do I need a computer

19  program for the simplest of simple theories.

20  Q.    Also in your report — and I believe you testified

21  about this on direct — you talked about the fact that

22  there are only two ways that a tube can be attached to

23  one of these items, correct?

24  A.    For the most part, yes.

25  Q.    And one of those ways you said someone would have to

Mr. Howard - Cross

1  be a good accomplished welder to do it?

2  A.   Yes, to make it work and function as a silencer,

3  yes.

4  Q.   But you agree it can be done?

5  A.   Only if you are a master welder.

6  Q.   So you agree it can be done?

7  A.   Are you asking me — it is remotely possible.

8  Therefore, he could be; therefore, he will; therefore, he

9  is guilty.  I would say no.

10            MR. BETRAS:  Objection, your Honor.

11            THE COURT:  To his answer?

12            MR. BETRAS:  Well, we are way far afield

13  now.  Your opinion has to be based on not mere

14  possibility.  Everything is merely possible.

15            THE COURT:  So you are objecting to his

16  answer?

17            MR. BETRAS:  I am objecting to the question

18  because she was asking him about a possibility.

19            THE COURT:  She asked about attachment of

20  something, of the item.

21  BY MS. HENDERSON

22  Q.   Mr. Howard, directing you back to my question, you

23  talked about on direct two ways in which tubes can be

24  attached, correct?

25  A.   Yes.

Mr. Howard — Cross

1    Q.    And you said one of those ways was by a very good

2    accomplished welder, correct?

3    A.    You would have to be very, very good.

4    Q.    So you are admitting that it can be done,

5    correct?

6    A.    I am also admitting that you can make a pillow a

7    silencer.  Are all people with pillows guilty of having

8    silencers?  No.

9    Q.    So the answer to my question is yes?

10   A.    In the completely abstract hypothetical, yes.

11   Q.    Because it would be completely abstract and

12   hypothetical to have a very good and accomplished

13   welder?

14   A.    Which means, theoretically, maybe a couple of

15   hundred people in this country who are aluminum welding

16   specialists could intentionally misuse this product and

17   make a silencer.

18   Q.    And you also said that the second way was that

19   someone could simply slide something over the unit, but

20   that if this was done, then the hot gases would fly back

21   and hit the shooter in the face.

22   A.    Yes.  I have already testified to that.

23   Q.    So again, you agree that it could be done?

24   A.    If you don't mind losing both eyes, yes.

25   Q.    Now, let's talk about your work in this case.  You

Mr. Howard - Cross

1   agree with me you are self employed?

2   A.   I couldn't hear you.

3   Q.   You are self-employed?

4   A.   Yes, ma'am.

5   Q.   And you make money from consulting and from your law

6   practice?

7   A.   Yes, ma'am.

8   Q.   And you have testified in many cases as a firearms

9   consultant?

10  A.   As a firearms expert, yes, ma'am.

11  Q.   And you were paid in those cases?

12  A.   Yes, ma'am.

13  Q.   You are being paid in this case?

14            MR. BETRAS:  Objection, your Honor.

15            THE COURT:  Overruled.

16  A.   I am losing about a hundred dollars an hour sitting

17  here.

18  Q.   You are being paid in this case?

19  A.   A hundred dollars less than if I had stayed home.

20  Q.   But you do this as a living to make money,

21  correct?

22  A.   Yes.

23  Q.   Okay.

24  A.   But I am a lot more interested in seeing that man

25  get a fair trial than I am in making money because if I

1   stayed home, I would be billing out at a hundred dollars

2   an hour more than I do while I sitting here.

3              MS. HENDERSON:  Move to strike, your Honor.

4              THE COURT:  Go ahead.  Just ask another

5   question.

6   BY MS. HENDERSON

7   Q.   You also testified on direct that the reason you

8   believe that nothing can be attached to these items is

9   because they are made out of an alloy material?

10  A.   No.  I testified that nothing can be attached

11  because there is no lip to put a thread and because it is

12  made out of aluminum and not steel.

13  Q.   Okay.  So you said because they are made out of

14  aluminum and not steel?

15  A.   Yes.

16             MS. HENDERSON:  May I approach the witness,

17  your Honor?

18             THE COURT:  You may.

19  BY MS. HENDERSON

20  Q.   I am handing you what has been marked as

21  Government's Exhibit 3.  You would agree that's not

22  aluminum, correct?

23  A.   I don't know what it is, but it is not aluminum.

24  Q.   You would agree with me that's steel?

25  A.   I don't know what it is.

Mr. Howard — Cross

1   Q.   You are unfamiliar with it being steel?

2   A.   Unfamiliar with it being steel?

3   Q.   But it is not aluminum, correct?

4   A.   It is definitely not aluminum.  That I will admit.

5              MS. HENDERSON:  Thank you.  May I have a

6   moment, your Honor?

7              THE COURT:  Sure.

8              (Pause.)

9   BY MS. HENDERSON

10  Q.   Mr. Howard, when we talked about muzzle brakes

11  earlier, you agreed most muzzle brakes are two to three

12  inches.  I think that's what you say in your report,

13  correct?

14  A.   That's the norm in the industry.

15  Q.   That's the norm.  And you said that's the norm

16  because that's what ATF says that's about how long it can

17  be?

18  A.   I don't know if that's the case or not.  I have seen

19  muzzle brakes on M2 .50 calibers, and I am sure it is a

20  lot longer than three inches.

21  Q.   But your testimony earlier today when I was

22  asking you about it is that —

23  A.   I said that's the general rule.

24  Q.   And you also said because if it were anything

25  longer, then ATF would call it a silencer?

Mr. Howard - Cross

1   A.   I don't remember saying that at all, no.

2   Q.   You would agree that anything longer ATF would call

3   it a silencer?

4   A.   Given their behavior in this case, yes, I think they

5   probably would just based on the length alone.

6   Q.   And you would disagree with that?

7   A.   Yes, I do.

8   Q.   But you would agree with me as a lawyer, if you

9   don't like a ruling, you can appeal it.

10              MR. BETRAS:  Objection, your Honor.

11              THE COURT:  Objection sustained.

12  A.   In the case of ATF —

13              THE COURT:  Objection sustained.

14  Q.   And when it comes to an ATF ruling, if you don't

15  like the ATF ruling, if you don't like the ATF ruling,

16  you can appeal their decision?

17              MR. BETRAS:  Objection, your Honor.

18              THE COURT:  Objection sustained.

19              MS. HENDERSON:  Can I have a moment, your

20  Honor?

21              (Pause.)

22  BY MS. HENDERSON:

23  Q.   Mr. Howard, you would agree with me that regardless

24  of whatever the rule is you can't just disregard the law

25  and do your own thing?

Mr. Howard – Redirect

1        MR. BETRAS:  Objection, your Honor.

2        THE COURT:  Overruled.

3   A.   Can you repeat the question?

4   Q.   You would agree with me that regardless of what the

5   rule is you can't just disregard it and do your own

6   thing?

7   A.   If you fall within the rule, yes.

8        MS. HENDERSON:  Thank you.  I have no

9   further questions at this time.

10       THE COURT:  Thank you.  Anything?

11       MR. BETRAS:  Yes, your Honor.

12             REDIRECT EXAMINATION

13  BY MR. BETRAS

14  Q.   Mr. Howard, am I paying you for your time, or am I

15  paying you for your opinion?

16  A.   I can't hear you with your back turned.  I'm sorry.

17  A lifetime of gun fire and rock and roll, and I am paying

18  the price now.

19  Q.   Am I paying you for your time, or am I paying you

20  for your opinion?

21  A.   You are paying for my time and nothing

22  more.

23  Q.   Okay.  And you don't work for free, right?

24  A.   No, I don't.  I have got to make a living like

25  everybody else.

Mr. Howard — Redirect

1    Q.   All right.  Does the fact that you were retained in

2    this case make your opinion any different than what you

3    are calling it as you see it?

4    A.   I routinely turn away people whose position I

5    cannot and will not support.  I cannot be bought at any

6    price.

7    Q.   Now, in light of everything that the U.S. Attorney

8    has asked you and in light of all of her questions, in

9    light in light of all of her, you know, going over your

10   father and the letters and all of that stuff, does that

11   in any way change your opinion in this case?

12   A.   No.

13   Q.   And your opinion in this case is what?

14   A.   That that's a muzzle brake.

15   Q.   And not a firearm?

16   A.   And not a firearm and not a silencer.

17              MR. BETRAS:  Thank you.  No further

18   questions.

19              THE COURT:  Anything, Ms. Henderson?

20              MS. HENDERSON:  Nothing further, your Honor.

21              THE COURT:  Thank you, Mr. Howard.  You are

22   excused.  Watch your step, please.

23              THE WITNESS:  Your Honor —

24              THE COURT:  You can just leave those there.

25              THE WITNESS:  Thank you.

1          THE COURT:  Okay.  Ladies and gentlemen that

2    will conclude our testimony today.  You had a long day.

3    I bet you will sleep tonight.  We appreciate your

4    patience for this.  We will be in adjournment until

5    tomorrow morning and meet on L1 at 8:30, and keep in mind

6    the admonition.

7          You've heard a lot of testimony.  You may or

8    may not have heard it all.  You don't know what the law

9    is that applies in the case, and so it is important to

10   keep an open mind, and that you not discuss the case with

11   anyone nor permit anyone to discuss it with you.  Have a

12   good night and rest.

13         Remember what I said, you can tell them you

14   are on a case, but don't mention what type of case or

15   anything, and that you will be able to speak about it

16   until your heart's content after a verdict is returned

17   here in open Court.  So have a good night, and we will

18   see you bright and early at 8:30.

19         (Jury out.)

20         THE COURT:  I will see the lawyers at 8:00

21   o'clock and go over the exhibits, and that's fair.

22         MR. BETRAS:  So the Court is aware, I have

23   no further witnesses, and we would rest.  I don't know if

24   they have rebuttal or not.

25         THE COURT:  I don't either.  We will meet at

1    8:00 o'clock, and we will go over that and figure that

2    out.

3                 (Trial adjourned at 4:50 p.m.)

4                      - - - - -

5

6

7                 C E R T I F I C A T E

8           I, George J. Staiduhar, Official Court

9    Reporter in and for the United States District Court,

10   for the Northern District of Ohio, Eastern Division,

11   do hereby certify that the foregoing is a true

12   and correct transcript of the proceedings herein.

13

14

15

16              s/George J. Staiduhar
                George J. Staiduhar,
17              Official Court Reporter

18              U.S. District Court
                801 W. Superior Ave., Suite 7-184
19              Cleveland, Ohio 44113
                (216) 357-7128
20

21

22

23

24

25